**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**J&A CONCRETE CORP.,**

**Plaintiff,**

**- against -**

**DOBCO INC.,**

**Defendant.**

---

**21-cv-11097 (JGK)**

**Opinion and Order**

**John G. Koeltl, District Judge:**

This case concerns a payment dispute between a general contractor, Dobco Inc. ("Dobco"), and a subcontractor, J&A Concrete Corporation ("J&A"). Dobco alleges that J&A abandoned its job as the concrete subcontractor on the 40th Precinct Police Station and that, as a result, Dobco was forced to use its own resources to complete the work. This Court has already determined that J&A breached its subcontract with Dobco by abandoning the job. Even though Dobco has received a $3.9 million payment on a performance bond securing J&A's performance, Dobco contends that J&A is responsible for additional damages that Dobco has sustained. Dobco has the burden of proving its damages with reasonable certainty.

J&A asserted six claims against Dobco; Dobco in turn asserted counterclaims for breach of contract and declaratory relief against J&A. After the parties cross-moved for summary judgment, the Court denied J&A's motion, entered summary judgment for Dobco on its breach-of-contract counterclaim as to liability only, and dismissed J&A's claims for breach of contract and

equitable relief. J&A Concrete Corp. v. Dobco Inc., No. 21-cv-11097, 2025 WL 605252 (S.D.N.Y. Feb. 24, 2025); see also ECF No. 153. The sole remaining issue after the Court resolved the motions for summary judgment was the measure of damages Dobco suffered as a result of J&A's breach of contract.

The Court held a non-jury trial from January 20, 2026 through January 27, 2026. Having reviewed the evidence and assessed the credibility of the witnesses, the Court now makes the following findings of fact and reaches the following conclusions of law pursuant to Federal Rule of Civil Procedure 52.

## FINDINGS OF FACT

### I. The Parties

1. At all relevant times, including the commencement of this action, Dobco was a corporation organized under the laws of New Jersey with its principal place of business at 1 Geoffrey Way, Wayne, New Jersey 07470. Joint Pretrial Order ¶ 3, ECF No. 204.

2. At all relevant times, including the commencement of this action, J&A was a corporation organized under the laws of New York with its principal place of business at 1676 Washington Avenue, Bohemia, New York 11716. Id.

3. The damages sought by Dobco on its breach-of-contract counterclaim exceed $75,000, exclusive of interest and costs. See Ex. D-3 (Subcontract price of $3,900,000).

## II. The Witnesses

4. The Court heard live testimony from five witnesses: Daniel Mladenovic, Dobco's president; Justin Johnson, Dobco's Project Executive; Antonio Martins, J&A's president; Robert Valentin, Dobco's Project Scheduler; and Feras A. Taher, J&A's designated expert on scheduling in the construction industry.

5. In addition, the deposition testimony of Peter Apospolidis, a representative of Arch Insurance Company, was read into the record. Tr. 468:5–20.

6. In making the findings that follow, the Court has considered each witness's demeanor, the plausibility and internal consistency of the testimony, the witness's interest in the outcome, and the consistency of the testimony with the contemporaneous documentary record. Where testimony conflicted with contemporaneous documents, the Court has generally credited the documents.

## III. The 40th Precinct Police Station Project, the Prime Contract, and the Project Specifications

7. Dobco is a general contractor. Tr. 417:1–2; Ex. D-4.[1]

8. On March 8, 2018, Dobco entered into a contract (the "Prime Contract") with the New York City Department of Design and Construction (the "Owner") to construct the 40th Precinct Police Station, located in the Bronx, New York (the "Project"). See Joint Pretrial Order ¶ 7(a).

9. The value of the Prime Contract was $57,700,000. Ex. D-4; Tr. 260:11–15.

---

[1] "Tr." refers to the trial transcript. "Ex. D" refers to Dobco's trial exhibits.

10. The Project architect was Bjarke Ingels Group ("BIG"). See Joint Pretrial Order ¶ 7(b).

11. The Project construction manager was The LiRo Group ("LiRo"). See id. ¶ 7(c).

12. As the Owner's construction manager, LiRo was the primary liaison between Dobco and the Owner. Tr. 36:25–37:3.

13. The Prime Contract included and incorporated by reference the City of New York Standard Construction Contract (the "Standard Contract"). Ex. D-1; Tr. 261:1–12.

14. Paragraph 1.2(A)(9) of Section 03 30 00 "Cast in Place Concrete" of the Project Specifications provides:

> Placing in the forms all inserts, anchors, anchor bolts, bearing plates, and the like furnished by other contractors for casting into the concrete and cleaning of same after stripping of forms.
>
> Ex. D-5 at 1.

15. Paragraph 3.7(A) of Section 03 30 00 "Cast in Place Concrete" of the Project Specifications provides:

> General: Set and build into work anchorage devices and other embedded items required for other work that is attached to, or supported by, cast-in-place concrete. Use setting drawings, diagrams, instructions, and directions provided by suppliers of items to be attached thereto.
>
> Id. at 25.

## IV. The Subcontract

16. On May 31, 2018, Dobco entered into a subcontract (the "Subcontract") with J&A, pursuant to which J&A agreed to perform certain concrete work on the Project in exchange for $3.9 million. See Joint Pretrial Order ¶ 7(d); Ex. D-3 §§ 1.1, 10.1.

## V. The Performance Bond

17. As a condition of the Subcontract, J&A was required to obtain a performance bond running to Dobco's benefit that guaranteed the performance of J&A's work under the Subcontract. See Ex. D-3 § 12.2.

18. Arch Insurance Company ("Arch"), as surety, together with J&A, as principal, issued a performance bond bearing bond number SU1144064 (the "Bond") in favor of Dobco as obligee in connection with the Subcontract. See Joint Pretrial Order ¶ 7(g); Ex. D-10. The penal sum of the Bond was $3,900,000. Ex. D-10 at 1.

19. The Bond provided that in the event J&A fails to perform under the Subcontract, Dobco could declare J&A in default, in which case Arch would be required either to (1) arrange for J&A to complete the Subcontract; (2) undertake to perform and complete the Subcontract itself; or (3) obtain bids or negotiated proposals from qualified contractors acceptable to Dobco for performance and completion of the Contract. Id. ¶ 4.

20. The Bond further provided that if Arch was unable to perform under paragraph 4 of the Bond in the event J&A defaulted and Dobco completed the Subcontract at a cost that "exceeds the Balance of the Contract Price," Arch

would be required to pay Dobco "such excess" up to the penal sum of the Bond. Id. ¶ 6.

## VI. The Owner Issued a Pre-Default Notice to Dobco

21. During the early stages of the Project, the Owner, based on delays on the Project, issued a pre-default notice to Dobco's performance bond sureties, Liberty Mutual Insurance Company ("Liberty") and Arch. Tr. 268:9–24.

22. Liberty and Arch in turn retained a consulting company, JS Held LLC to assist with getting the Project back on schedule. Id.

23. The issues leading the Owner to issue Dobco a pre-default notice were fully resolved by early 2021. Tr. 268:25–269:2.

## VII. The Change Orders

24. During the Project, Dobco and J&A agreed to several change orders resulting in an adjusted Subcontract price of $4,180,807.03:

| Change Order Description | Value | Exhibit |
|---|---|---|
| C.O. #1 Bracing of AutoZone Foundation | $115,886.40 | Ex. D-41 |
| C.O. #2 Additional Soil Anchors Under Piers | $67,886.68 | Ex. D-42 |
| C.O. #3 Unforeseen Condition Underpinning | $17,622.77 | Ex. D-43 |
| C.O. #4 T&M Elec Conduit Trenching Under SOG | $32,637.76 | Ex. D-44 |
| C.O. #5 Credit For General Cut | ($90,000.00) | Ex. D-45 |
| C.O. #6 RFI-073 | $6,000.00 | Ex. D-46 |
| C.O. #7 OE for waterproofer and Ladder Plat. | $2,500.00 | Ex. D-47 |
| C.O. #8 Winter concrete #1 | $2,200.00 | Ex. D-48 |

| | | |
|---|---|---|
| C.O. #9 Winter concrete #2 | $4,000.00 | Ex. D-49 |
| C.O. #10 Saturday premium time | $10,000.00 | Ex. D-50 |
| C.O. #11 MEP Louver Opening Modification | $1,000.00 | Ex. D-51 |
| C.O. #12 Steel Crane Pad Preparation | $10,000.00 | Ex. D-52 |
| C.O. #13 OE for Waterproofer and Insulation | $1,135.00 | Ex. D-53 |
| C.O. #14 Winter Concrete #3 | $2,500.00 | Ex. D-54 |
| C.O. #15 Winter Concrete #4 | $6,000.00 | Ex. D-55 |
| C.O. #16 Bulletins 7 and 11 | $20,000.00 | Ex. D-56 |
| C.O. #17 Complete Mock-up Jan/Feb. | $100,000.00 | Ex. D-57 |
| C.O. #18 Lost time due to waterproofing | $9,000.00 | Ex. D-58 |
| C.O. #19 Additional Mobilization for Backfill | $11,065.30 | Ex. D-59 |
| C.O. #20 Additional Mobilization for Backfill | ($30,322.05) | Ex. D-60 |
| C.O. #21 Additional Mobilization for Backfill | ($17,941.70) | Ex. D-61 |
| C.O. #23 Punching Holes Through SS Angles | ($363.13) | Ex. D-63 |
| | | **Total: $280,807.03** |

See Joint Pretrial Order ¶ 7(e); see also Tr. 269:23–270:20.

25. During the course of the Project, Dobco also issued several deductive change orders to J&A that reduced J&A's scope of work and the balance of the Subcontract price.

### A. Deduct Change Order 22

26. By email dated November 16, 2020, Dobco directed J&A to install certain steel embeds. Ex. D-13; see also Tr. 573:12–15.

27. The embeds were "steel materials that were required to be installed into . . . cast-in-place concrete slabs on decks for the purposes of supporting precast panels that [were] going to be installed by" another subcontractor. Tr. 271:23–272:2.

28. The nature of the work required that the embeds "be installed at the time when the concrete was being poured." Tr. 272:6–7.

29. Article 8.1.5 of the Subcontract required J&A to "provide all labor, equipment and tools to coordinate and install all required embedded materials supplied by others, including but not limited to anchor bolts, base plates, sleeves, etc." Ex. D-3 § 8.1.5; Tr. 272:24–273:5.

30. Paragraph 3.7(A) of Section 03 30 00 of the Project Specifications, titled "Cast in Place Concrete," provides that J&A was responsible for "[s]et[ting] and build[ing] into work anchorage devices and other embedded items required for other work that is attached to, or supported by, cast-in-place concrete." Ex. D-5 ¶ 3.7(A).

31. Dobco's president, Daniel Mladenovic, testified credibly that paragraph 3.7 of Section 03 30 00 of the Project Specifications required J&A to install the steel embeds discussed in Dobco's November 16, 2020 email. He testified as follows:

> Q. And describe again, you know, why the items reflected in the change order that you just discussed that was marked as Exhibit 62, why that falls within this specification.

> A. So that embed is required for the architectural precast panels that are the façade of the building. So these embeds exist at the concrete slab. So it needs to be set at the time when the concrete is poured, so that way it cures and strengthens around the concrete as it cures and strengthens. So this embed, which is a steel plate with a sheet stud attached to the underside, and that basically holds the position that will allow a connecting plate or otherwise to be either screwed onto or welded to the plate for purposes of stabilizing or supporting the precast panel, depending on where it exists in the floors.
>
> Q. So looking at 3.7, subpart A, where it describes the phrase "other work," would that be the panels?
>
> A. Yes.
>
> Q. And then the part that says "attached to or supported by the cast in-place," that's because the panel are attached to or supported by the cast-in-place?
>
> A. Well, the embed is supported by the cast-in-place concrete.
>
> Q. And that, in turn, supports the panels.
>
> A. Correct.
>
> Tr. 274:15–275:12.

32. Despite its contractual obligations under Article 8.1.5 of the Subcontract and Section 03 30 00 of the Project Specifications, J&A refused to perform the embed work discussed in Dobco's November 16, 2020 email. Tr. 278:2–12; cf. Ex. D-12 (July 23, 2020 email from J&A's president, Antonio Martins, to Dobco employees stating that "[t]he precast details on the contract

documents did not include embeds" and that the embed work was "clearly not part of [J&A's] scope").

33. Dobco hired another subcontractor, Midwest Steel, to perform the steel embed work discussed in Dobco's November 16, 2020 email. Ex. D-14; see also Ex. D-62.

34. Dobco incurred $65,336 in total costs to perform the embed work referenced in Dobco's November 16, 2020 email. Ex. D-14; Ex. D-62.

35. On December 4, 2020, Dobco issued J&A a deduct change order bearing change order number 22 for $65,336 ("Change Order 22") as a result of J&A's refusal to perform the embed work. Ex. D-62. The deduct change order reduced the balance of the Subcontract.

**B. Deduct Change Orders 26–29**

36. On May 25, 2021, Dobco issued J&A a deduct change order bearing change order number 26 for $2,653.90 ("Change Order 26") to correct J&A's defective setting of embeds in its concrete work. Ex. D-66; see also Tr. 42:13–43:2 (Mr. Johnson discussing Change Order 26).

37. On May 25, 2021, Dobco issued J&A a deduct change order bearing change order number 27 for $9,171.60 ("Change Order 27") to reflect the engineering cost incurred as a result of J&A's defective concrete work. Ex. D-64; see also Tr. 43:3–13 (Mr. Johnson discussing Change Order 27).

38. On June 1, 2021, Dobco issued J&A a deduct change order bearing change order number 28 for $9,144.43 ("Change Order 28") to correct exposed

aggregate on the roof slab-on-deck. Ex. D-65; see also Tr. 44:20–45:9 (Mr. Johnson discussing Change Order 28).

39. Dobco notified J&A of the roofing issue and the need to perform corrective work, but J&A refused to perform this work. Tr. 44:20–45:9; see also Ex. D-168 at 1 (April 19, 2021 email from Justin Johnson to Antonio Martins informing J&A of issues with the roof); Ex. D-167 at 1–2 (June 11, 2021 email chain including email from Antonio Martins to Justin Johnson in which Martins responds to inquiries about J&A's intention to complete roof remediation by referring to its June 4, 2021 subcontract-termination letter).

40. On August 7, 2021, Dobco issued J&A a deduct change order bearing change order number 29 for $95,117.18 ("Change Order 29") to perform excavation and installation of drainage structures and drainage piping within J&A's scope of work. Ex. D-67; see also Tr. 45:18–46:4 (Mr. Johnson discussing Change Order 29).

## VIII. J&A Ceased to Perform Work Under the Subcontract and Abandoned the Project

41. J&A ceased performing all work on the Project as of May 24, 2021. See Joint Pretrial Order ¶ 7(h).

42. J&A did not return to the Project site after demobilizing on May 24, 2021. Tr. 39:17–22 ("Q: Now, did there come a point in time when J&A ceased performing work on the project? A: Yeah. Towards the end of May 2021, they ceased performing. Q: And then after that date, did J&A ever return to perform any work on the project? A: No, they did not.").

43. J&A's counsel informed Dobco on June 4, 2021, that J&A was terminating the Subcontract pursuant to Section 7.1 of the Subcontract. Ex. D-18 at 1. J&A sent Dobco another letter on June 9, 2021 explaining that J&A had terminated the Subcontract. Tr. 50:20–23; see also Ex. D-167 at 3.

44. J&A refused to complete the embed work and refused to be responsible for Change Order 22, which reflected the work Dobco paid to have the embed work done and reduced the amount J&A would be paid by $65,336.

45. J&A's primary basis for its purported termination of the Subcontract was its dispute over Dobco's issuance of Change Order 22. Ex. D-18 at 2.

46. J&A's president, Antonio Martins, acknowledged that before terminating the Subcontract, J&A could instead have obtained payment of the full undisputed amount owed while preserving its right to dispute Change Order 22 by executing a lien waiver with reservation-of-rights language. Tr. 583:24–584:15. J&A's purported termination of the Subcontract was ineffective and in breach of the Subcontract. J&A Concrete, 2025 WL 605252, at *12.

47. As of August 7, 2021, the adjusted Subcontract value, including approved and deductive change orders, was $3,999,383.92:

| Item | Value | Exhibit |
|---|---|---|
| Subcontract Price | $3,900,000 | Ex. D-3 |
| Approved Change Orders | $280,807.03 | Joint Pretrial Order ¶ 7(e) |
| Change Order 22 | ($65,336.00) | Ex. D-14; Ex. D-62 |
| Change Order 26 | ($2,653.90) | Ex. D-66 |

| | | |
|---|---|---|
| Change Order 27 | ($9,171.60) | Ex. D-64 |
| Change Order 28 | ($9,144.43) | Ex. D-65 |
| Change Order 29 | ($95,117.18) | Ex. D-67 |
| | | **Total: $3,999,383.92** |

48. At the time J&A purported to terminate the Subcontract, Dobco had paid J&A $2,216,030.43. Joint Pretrial Order ¶ 7(f); see also Tr. 283:13–14.

49. As of August 7, 2021—the date of Change Order 29—the remaining Subcontract balance was $1,783,353.49, the difference between the adjusted Subcontract value ($3,999,383.92) and what J&A had been paid ($2,216,030.43).

## IX. Dobco's Notice of Default, Subsequent Termination of the Subcontract, and Dobco's Claim Against the Bond

50. On June 9, 2021, Dobco issued a notice of default (the "Notice of Default") to J&A pursuant to Section 3.5.1 of the Subcontract based on J&A's abandonment of the Project and its refusal to perform any further work under the Subcontract. Ex. D-11.

51. Dobco and Arch made repeated efforts to convince J&A to return to the Project to complete its work under the Subcontract, including by offering to allow J&A to preserve its right to dispute Change Order 22. Tr. 279:16–280:8.

52. Despite Dobco's and Arch's efforts to convince J&A to return to the Project, J&A refused to perform in response to the Notice of Default or return

to the Project. Ex. D-167 (Mr. Martins declining to perform roof remediation work by referencing J&A's purported termination of the Subcontract); see also Tr. 280:9–19.

53. On June 21, 2021, Dobco issued a seven-day notice of intent to terminate the Subcontract as a result of J&A's failure to cure its default as set forth in the Notice of Default. Ex. D-19 at 3 (noting that "Dobco maintains its positions as set forth in its prior communications, including June 21, 2021 Seven-Day Notice pursuant to Section 7.1.1.3 of the referenced subcontract dated May 31, 2018"); see also Tr. 554:4–9.

54. J&A again refused to perform under the Subcontract and indicated that it would agree to return to the Project only if Dobco agreed to renegotiate the Subcontract. Tr. 280:13–19; Tr. 552:15–553:6, 553:16–554:3.

55. Arch's representative, Peter Apospolidis, confirmed during his deposition, which was read into the record during the trial, that J&A would resume work only if Dobco agreed to renegotiate the Subcontract:

> Q. So the original question, you do recall J&A making that offer between June 2021 and August 2021?
>
> A. It was an offer with conditions.
>
> Q. What conditions did you understand?
>
> A. The condition is to renegotiate a new contract.
>
> Tr. 468:5–20.

56. Consistent with that position, Mr. Martins testified that, in J&A's view, J&A owed Dobco no further legal obligations of any kind following J&A's

purported termination of the Subcontract on June 4, 2021. Tr. 554:1–13, 554:19–24.

57. This Court has already determined that J&A breached the Subcontract. J&A's purported termination of the Subcontract and abandonment of the Project constituted a breach of the Subcontract. J&A Concrete, 2025 WL 605252, at *12.

58. On July 15, 2021, Dobco terminated the Subcontract with J&A as a result of J&A's abandonment of the Project (the "Termination Notice"). Ex. D-20; see also Joint Pretrial Order ¶ 7(i).

59. J&A stated that the Termination Notice was "moot" because J&A "had already terminated the contract in June" and because "[t]here was no contractual relationship after [J&A's] termination." Tr. 555:10–556:12.

60. J&A was wrong because its purported termination of the Subcontract was in breach of the Subcontract.

61. In the Termination Notice, Dobco made a demand on J&A's surety, Arch, to perform pursuant to paragraph 4 of the Bond. Ex. D-20 at 3; see also Ex. D-10 ¶ 4.

## X. Bulletin 12

62. On April 19, 2021, the Owner issued its second and final revision to Bulletin #12 ("Bulletin 12"). Ex. D-23.

63. Bulletin 12 modified the scope of the work on the Project, including the scope of J&A's work. Id.; see also Tr. 47:3–13 ("[T]he major item was the

removal of a cast-in-place concrete retaining wall and the remediation of an existing retaining wall on the north—far north parking lot.").

64. Bulletin 12 identified several additions to and deductions from the Prime Contract. Ex. D-23; see also Tr. 47:4–7 ("So bulletin 12 was an owner-initiated change order. Bulletin 12 was a pretty large change. It involved a variety of additions to the contract and a variety of deducts from the contract.").

65. The additional work expanded the scope of non-concrete work performed by other subcontractors, including landscaping, electrical, site-plumbing, and asphalt-paving, while simultaneously reducing the scope of concrete work originally set to be performed by J&A. Tr. 47:4–13; Tr. 371:7–17; Ex. D-23. Therefore, it reduced the balance of the Subcontract price to be paid to J&A.

66. On April 22, 2021, Dobco provided a copy of the revised draft of Bulletin 12 to J&A by email. Ex. D-23; see also Tr. 48:22–49:4 ("We sent any revision such as this to the subcontractors. We did send this to J&A, and I do recall that we asked them for a proposal.").

67. On April 27, 2021, J&A submitted a proposed estimate that reduced the value of the Subcontract by $29,526.32 as a result of Bulletin 12. See Ex. J&A-109 at 8; Tr. 507:25–508:10.[2]

68. LiRo did not accept J&A's proposal and instead prepared an estimate of the value of the work added to and subtracted from the Prime Contract

[2] "Ex. J&A" refers to J&A's trial exhibits.

as a result of the modifications introduced by Bulletin 12. Ex. D-36; see also Tr. 50:24–51:4 ("[LiRo] provide[d] an estimate based on the whole bulletin 12 package, revision 1, revision 2, and that's the estimate the owner uses to determine the total cost associated with the change order.").

69. On June 11, 2021, Dobco sent J&A an email requesting that J&A return to work on the Project and provide a cost proposal concerning Bulletin 12:

> [W]e require J&A's revised Bulletin 12 proposal by no later than COB Monday. If not received then Dobco will be forced to accept LiRo's estimate for the Bulletin 12 work, including any credits against J&A's account.
>
> Ex. D-167 at 2.

70. J&A refused to return to the Project and failed to provide Dobco with a revised proposal in response to Dobco's June 11, 2021 email. Id. at 1 (Mr. Martins responding to the request for a revised Bulletin 12 proposal by stating, "Kindly reference J&A's notice from June 4 and June 9, 2021"); see also Tr. 560:4–17.

71. Mr. Martins testified as follows with respect to Dobco's June 11, 2021 request for a revised Bulletin 12 proposal:

> Q. Mr. Johnson's email to you – from June 11, 2021, asks that J&A return to perform work, and, secondly asks for J&A to comment on bulletin 12 or Dobco will be forced to accept LiRo's estimate. Is that right?
>
> A. Yes.
>
> Q. And you did not return to work after receiving this letter, correct?

> A. That is correct.
>
> Q. You did not provide positions as it relates to bulletin 12 after this letter, correct?
>
> A. No sir, [w]e provided it before the letter.
>
> Q. I'm going to ask my question again. After receiving this letter, did you provide Dobco the requested information? Yes or no?
>
> A. No.
>
> Q. And, in fact, do you recall what your response was to this email?
>
> A. I saw it earlier. I reference the time that we actually sent our termination on June 9.
>
> Q. Because since you terminated the contract, nothing else mattered, right?
>
> A. Well, if the contract was terminated, my understanding at the time was that if the contract allowed for that termination and the termination was done correctly, then it didn't.
>
> Tr. 558:10–559:9.

72. Because J&A failed to provide Dobco with a revised Bulletin 12 proposal, Dobco accepted LiRo's estimate for the value of the concrete work removed by Bulletin 12. Tr. 50:4–17, 51:5–17.

73. As a result of the Owner's issuance of Bulletin 12 and LiRo's determination of the value of the work reduction, the scope of J&A's work, and thus the value of the Subcontract, was reduced by $844,300.84. Ex. D-163; see also Tr. 52:8–53:8.

74. Although Bulletin 12 resulted in an $844,300.84 reduction in the value of the concrete work, that deduction was offset by an equivalent amount of additional work that Bulletin 12 added to the scope of other non-concrete work, which resulted in a net-zero change to the value of the Prime Contract. Tr. 54:10–55:5; Tr. 149:11–150:19; Tr. 371:22–372:9.

75. Because the Owner directed that the savings from the removed concrete work be reallocated to pay for the additional work in other trades, the $844,300.84 concrete deduction was credited against the Subcontract balance.

76. Because Bulletin 12 was a net-zero change to the value of the Prime Contract, the Owner did not issue a formal change order for Bulletin 12. Tr. 377:5–8; Ex. D-24 at 1, 4 (LiRo email rejecting Dobco's proposed change order in connection with Bulletin 12).

77. After accounting for Bulletin 12, the remaining Subcontract balance of $1,783,353.49 was reduced to $939,052.65. Tr. 319:16–21. This was an accurate determination of the Subcontract balance for the remaining concrete work.

## XI. Arch Investigated Dobco's Claim Against the Bond

78. Arch undertook an independent investigation of Dobco's claim against the Bond. Ex. D-21 ¶ G.

79. Arch, through its construction consultant, Beacon Consulting Services, Inc. ("Beacon"), sought a replacement contractor to tender to Dobco to complete the Subcontract. See Joint Pretrial Order ¶ 7(j).

80. Beacon obtained the following prices to complete J&A's Subcontract from potential replacement contractors:

| Bidder | Cedric Construction Corp. | NY Asphalt | Navillus | Darcon Construction Inc. | Brickens Construction Inc. |
|---|---|---|---|---|---|
| **Base Bid Price** | $3,404,870 | $6,164,850 | $5,138,000 | $5,558,000 | $7,872,344 |
| **Total Revised Bid Price** | $3,432,870 | $4,684,850 | $4,583,000 | $4,888,000 | $6,614,848 |
| **Exhibit** | Ex. D-27 | Ex. D-26 | Ex. D-28 | Ex. D-29 | Ex. D-25 |

81. The foregoing prices were based on the reduced scope of work as prescribed by Bulletin 12. Exs. D-25, D-26, D-27, D-28, D-29, & D-30 (Beacon bid package summary).

82. Cedric Construction Corporation, NY Asphalt, and Darcon Construction Inc. withdrew their bids. Joint Pretrial Order ¶ 7(k).

83. The Owner rejected Navillus's bid. Id.

84. The sole remaining available completion contractor was Brickens Construction Inc., whose lowest bid to complete J&A's scope of work was $6,614,848. Tr. 460:24–461:11.

85. Because no completion contractor was available at a price within the balance of the Subcontract, Arch was unable to perform under paragraph 4 of the Bond, and Dobco self-performed the remaining Work. Tr. 288:3–13; see also infra Section XII.

86. On February 22, 2022, Arch executed a settlement agreement (the "Settlement Agreement") with Dobco. See Joint Pretrial Order ¶ 7(l); Ex. D-21.

87. As part of the Settlement Agreement with Dobco, Arch paid Dobco the $3,900,000 penal sum of the Bond. Ex. D-21 ¶ 1.

88. Dobco credits the $3,900,000 it received from Arch against any costs attributable to J&A. Tr. 17:1–3 ("There's also no dispute that the surety paid Dobco via settlement $3.9 million, which certainly Dobco has to use in order to calculate its damages.").

## XII. Dobco Completed the Remaining Concrete Work

89. Beginning on March 18, 2022, after Arch was unable to secure a suitable completion subcontractor at a price within the balance of the Subcontract, Dobco proceeded to complete J&A's remaining scope of work on the Project. Tr. 183:8–10 (Valentin noting that "J&A's last day on the site prior to their default was May 24, 2021. Concrete work did not resume onsite until March 18, 2022").

90. Aside from Bulletin 12 and a small modification to an underground detention tank that did not materially affect the cost of J&A's work, there was no change to the scope of the concrete work after J&A's purported termination of the Subcontract. Tr. 359:4–7.

### A. Dobco Hired Labor to Complete the Remaining Concrete Work

91. To complete J&A's work, Dobco was required to hire labor, procure materials, mobilize its own equipment, rent additional equipment, and retain

subcontractors to perform work it could not self-perform. Tr. 288:14–20 (Mladenovic: "So we had direct labor, we had materials that needed to be purchased, we had equipment that needed to be rented, we had our own equipment that was utilized, we had to hire some subcontractors to perform certain aspects of the work that we weren't able to do.").

92. To perform the majority of the work, Dobco used its own labor, consisting of its crews from New Jersey combined with local union workers whom Dobco hired in agreement with the local union. Tr. 64:4–7 (Johnson: "But otherwise, for the bulk of the actual labor for concrete work, we self-performed with our own crews from Jersey combined with local union men who we would hire in agreement with the union."); see also Tr. 288:10–13.

93. Dobco's job-site superintendent recorded labor information for those laborers completing J&A's scope of work and reported that information to the home office on a weekly basis. Tr. 123:23–25 (Johnson: "The job site assistant super or super would record the weekly payroll. That gets reported back to home office.").

94. Dobco's home-office personnel used the weekly information provided by the site superintendent to track all labor expended to complete J&A's work within its payroll and accounting systems, allocating the labor cost to perform the concrete work to J&A's account. Tr. 70:8–13 (Johnson noting that Dobco's "direct labor" was "tracked through our payroll and accounting system. The person on site performing the concrete work, on the home office, they would allocate it towards J&A's account").

95. Based on these weekly records, Dobco maintained a report that identified all individuals who performed labor to complete J&A's scope of work, along with time periods, amount of pay, amount of employer taxes, and amount of fringe benefits paid. Ex. D-99 (report generated by Dobco's accounting software showing labor costs for activity allocated to the concrete cost code).

96. Dobco's accounting system tracked costs by cost code, and all concrete work on the Project was coded to a single concrete cost code, against which Dobco had budgeted the original $3,900,000 Subcontract price. Ex. D-99 was generated from that system and reports the labor charged, by individual laborer, to the concrete cost code after J&A's default. Mr. Mladenovic testified as follows:

> Q. And how was this generated?
>
> A. So in the construction accounting world, there are cost codes. So we prepare a budget that allocates certain values. In this particular case, we had a budget of 3,900,000 in subcontractor costs for concrete . . . . So these labor costs that are shown in this report are reflected on printing out or developing a report that shows the activity of labor cost that took place within a period of time that was allocated to the concrete cost code.
>
> Q. How did you identify the individuals such to allocate them to that cost code?
>
> A. Well, those are individuals that reported to that job. There were sign-in sheets, there was certified payroll reports prepared based on the accounting records of those individuals being on the project.

> Q. So the data here is consistent with the certified payroll records?
>
> A. Yes.
>
> Q. And these are the individuals who Dobco used to finish J&A's scope of work?
>
> A. Yes.
>
> Tr. 288:21–289:22.

97. The Court finds that Dobco incurred $**1,389,788.41** in labor costs to complete J&A's work on the Project. Ex. D-99.

### B. Dobco Used Its Own Heavy Equipment to Complete the Remaining Concrete Work

98. Dobco used the following pieces of its own heavy equipment to complete J&A's Subcontract work: (i) Wacker Robot Roller; (ii) CAT 324 Excavator; (iii) CAT 305E Excavator; (iv) CAT IT38G Wheel Loader; (v) Komatsu D39PX Bulldozer; (vi) CAT 308 Excavator; and (vii) Mini Excavator with Hammer. Ex. D-97 (Dobco equipment rate sheet). Mr. Johnson testified as follows:

> Q. Do you know whether or not Dobco actually used this equipment on the job?
>
> A. Yes. We used all the pieces of equipment at various times on the project to do J&A's work.
>
> Q. And do you generally know the duration that Dobco used them?
>
> A. Generally, yes. During the period that we were doing excavation, we would have had the equipment there. The exact duration, I would have to look at it. But any time the equipment came, we would have to log it as on site, and then when it left, it would be

removed from the site, so it would not be tracked as on the site any longer.

Tr. 65:7–20.

99. Mr. Mladenovic also testified about Ex. D-97 as follows:

Q. First, the equipment that's identified on the list, why is that equipment identified?

A. So this is the equipment that was expressly used for the specific activities to complete the balance of work that remained from J&A.

Tr. 291:9–14.

100. Dobco's heavy equipment remained on the Project site only during periods when its use was necessary for each category of completion work because transporting heavy equipment back and forth between uses would have been more costly. Tr. 65:15–20; Tr. 66:3–11.

101. Dobco's heavy equipment remained on the Project site for the following numbers of days while Dobco completed J&A's work:

| Heavy Equipment Name | Duration on Project Site |
|---|---|
| Wacker Robot Roller | 100 |
| CAT 324 Excavator | 80 |
| CAT 305E Excavator | 50 |
| CAT IT38G Wheel Loader | 45 |
| Komatsu D39PX Bulldozer | 45 |
| CAT 308 Excavator | 50 |
| Mini Excavator with Hammer | 30 |

Tr. 65:21–66:12 (Johnson); Tr. 293:1–8 (Mladenovic).

102. Mr. Mladenovic determined the duration each piece of heavy equipment remained on the site based on Dobco's payroll records, his frequent visits to the Project during the completion work, and his assessment of the time required to perform each task with the equipment in question. Tr. 293:1–8.

103. For example, Mr. Mladenovic calculated the duration of time that the Wacker Robot Roller was on site based on his regular visits to the Project site, his knowledge that the Wacker Robot Roller was used to compact the sub-grade of the excavation work, and his frequent on-site observations and review of Project records. Tr. 356:15–357:1.

104. Although these durations are estimates rather than precise measurements, they derive from Dobco's contemporaneous payroll records, Mr. Mladenovic's frequent observation of the work as it was performed, and his knowledge of the tasks each piece of heavy equipment was used to perform. Tr. 293:1–8; Tr. 356:15–357:1. They are corroborated by Mr. Johnson's independent testimony as to the same durations. Tr. 65:21–66:12. J&A offered no contrary evidence as to the time any piece of heavy equipment remained on the Project.

105. The Owner accepted and issued change orders to Dobco on the Project using equipment rental rates published in the Blue Book, a nationally published guide that identified rental rates for specific pieces of heavy equipment. Tr. 291:17–292:7 (Mladenovic noting that Dobco "used [the Blue Book rates] for change orders previously, which . . . w[ere] incorporated into changes

that took place and change order documents that were approved . . . [o]n this project").

106. The Blue Book rates for the Dobco-owned heavy equipment that Dobco used to complete J&A's work on the Project are as follows:

| **Equipment Name** | **Blue Book Daily Rate** |
|---|---|
| Wacker Robot Roller | $206.16 |
| CAT 324 Excavator | $699.71 |
| CAT 305E Excavator | $175.35 |
| CAT IT38G Wheel Loader | $375.58 |
| Komatsu D39PX Bulldozer | $382.50 |
| CAT 308 Excavator | $299.87 |
| Mini Excavator with Hammer | $144.53 |

Ex. D-97; see also Tr. 291:17–292:1 (Mladenovic explaining that the rates outlined in Ex. D-97 are "based on the Blue Book value assigned"); Tr. 292:8–18 (explaining Blue Book rate adjustments for New York region).

107. The Blue Book daily rates reflect the reasonable value of the use of the heavy equipment Dobco employed to complete J&A's scope of work. Applying those rates to the durations found above, the reasonable value of Dobco's heavy equipment usage was $138,803.30:

| Equipment Name | Blue Book Daily Rate | Duration on Project | Total |
|---|---|---|---|
| **Wacker Robot Roller** | $206.16 | 100 | $20,616.00 |
| **CAT 324 Excavator** | $699.71 | 80 | $55,976.80 |
| **CAT 305E Excavator** | $175.35 | 50 | $8,767.50 |
| **CAT IT38G Wheel Loader** | $375.58 | 45 | $16,901.10 |
| **Komatsu D39PX Bulldozer** | $382.50 | 45 | $17,212.50 |
| **CAT 308 Excavator** | $299.87 | 50 | $14,993.50 |
| **Mini Excavator with Hammer** | $144.53 | 30 | $4,335.90 |
| | | | **Total: $138,803.30** |

108. Accordingly, the Court finds that the reasonable value of the Dobco-owned equipment used to complete J&A's scope of work was **$138,803.30**.

### C. Dobco Hired Subcontractors to Complete the Remaining Concrete Work

109. Dobco hired several subcontractors, vendors, and suppliers to perform certain specified work and supply certain equipment or materials necessary to complete J&A's scope of work.

110. Mr. Johnson and Mr. Mladenovic each testified in general terms that the entities listed in Ex. D-174 were retained in connection with

completing J&A's scope of work. Tr. 66:16–22 (Johnson testimony that entities listed in Ex. D-174 were "a series of subcontractors, vendors, suppliers who [Dobco] had to hire or use or buy equipment or rent equipment from in order to complete J&A's work"); Tr. 293:23–25 (Mladenovic testimony that entities listed in Ex. D-174 were "vendors that were used for material purchases, equipment rentals, subcontractors who had to correct some work that J&A did incorrectly"). Testimony of this kind is evidence, and Dobco was entitled to carry its burden with it. Its weight, however, depends on the foundation the witness had for it, and the Court has assessed that foundation vendor by vendor rather than treating a summary characterization of a list as establishing the attribution of every charge on it.

111. Where such testimony was not undercut on cross-examination, contradicted by the invoices, or met by evidence that the vendor's charges served other trades, the Court has credited it and awarded the charges. Where Dobco's own witnesses, examined about a particular vendor, disclaimed knowledge of what portion of that vendor's charges related to concrete work, the general testimony cannot supply what the specific testimony withheld. See, e.g., Tr. 136:19–137:19 (Cardella); Tr. 137:25–138:6 (D&A); Tr. 397:12–24 (Kamco). Where the invoices affirmatively describe items unrelated to concrete work, or where J&A introduced evidence that the vendor's charges served other trades and Dobco offered nothing permitting the Court to separate the concrete-related portion, the Court has declined to award the charges.

112. Under the Subcontract, J&A was responsible for all cast-in-place and structural concrete work on the Project. Ex. D-3 § 8.1.1 ("The Subcontractor shall detail, submit, purchase, deliver, install and warranty all the cast in place concrete scope of work . . . ."); Ex. D-5 (Project Specifications § 03 30 00). Accordingly, materials and services used to perform the concrete work on the Project—including concrete, reinforcing steel, formwork, cement, and concrete pumping—were within J&A's scope of work.

113. Dobco sought $1,592,326.83 in vendor, supplier, and subcontractor costs to complete J&A's scope of work. For the reasons set forth below, the Court finds that Dobco established $973,735.16 of that amount as costs incurred to complete J&A's scope of work, and declines to award the balance. See infra ¶¶ 230–32.[3]

[3] Where the amount reflected on a cashed check differs from the amount of the corresponding invoice, the Court has relied on the cashed check. The measure of Dobco's recoverable damages is the cost it actually incurred to complete J&A's scope of work, not the amount a vendor billed. A cashed check establishes the sum Dobco in fact paid, whereas an invoice reflects only the amount charged. In the cases presented here, the cashed checks were almost uniformly less than the corresponding invoices, and the Court has accordingly credited the lower amounts actually paid. This approach does not affect the Court's separate determination, made vendor by vendor below, whether a given cost was attributable to work within J&A's scope; the cashed checks establish the amount of each cost, while the record as a whole establishes whether that cost is recoverable.

### 1. Equipment Rentals

### Ahern

114. Dobco rented equipment from Ahern Rentals ("Ahern"). Ex. D-73; Tr. 67:5.

115. Dobco incurred $13,482.38 in costs to retain Ahern. Ex. D-73.

116. Although the Ahern invoices do not, on their face, describe items related to concrete, Mr. Johnson testified that Dobco used Ahern's equipment to complete work within J&A's scope. Tr. 69:3–6. J&A challenged only a single Ahern invoice, discussed below, and offered no evidence that any other portion of Ahern's charges fell outside J&A's scope of work.

117. On May 20, 2021, Ahern invoiced Dobco for $2,303.25 for miscellaneous equipment rentals for the time period between May 10, 2021, and May 13, 2021. Ex. D-73 at -61340.

118. Mr. Mladenovic acknowledged during his cross-examination that this invoice charged for equipment rental that happened almost two months before Dobco terminated the Subcontract:

> Q. Do you see the column that says billed to May 13, 2021?
>
> A. Well, that just represents that the invoice is for that period of time.
>
> Q. Correct. For the period of service or the period of use of this particular piece of equipment referenced on this invoice, correct?
>
> A. Correct.

> Q. And that's two months prior to Dobco terminating the subcontract, correct?
>
> A. I believe so.
>
> Tr. 386:17–387:1.

119. The equipment covered by this invoice was used between May 10 and May 13, 2021—before J&A ceased work on the Project on May 24, 2021, and well before Dobco terminated the Subcontract on July 15, 2021. This charge therefore predates J&A's default and does not represent a cost Dobco incurred as a result of that default or to complete J&A's scope of work.

120. The Court finds that Dobco incurred **$11,179.13** in costs to retain Ahern to perform work within J&A's scope.

**Sunbelt Rentals**

121. Dobco rented equipment from Sunbelt Rentals ("Sunbelt"). Ex. D-91; Tr. 67:23.

122. Dobco incurred $15,775.09 in costs to retain Sunbelt. Ex. D-91.

123. Although the Sunbelt invoices do not, on their face, describe items related to concrete, Mr. Johnson testified that Dobco used Sunbelt's equipment to complete work within J&A's scope. Tr. 66:23–25, 67:23; Tr. 69:3–6. J&A did not dispute that Dobco retained Sunbelt to complete work within J&A's scope.

124. The Court finds that Dobco incurred **$15,775.09** in costs to retain Sunbelt to perform work within J&A's scope.

**Drobach Equipment**

125. Dobco rented equipment from Drobach Equipment ("Drobach"). Ex. D-81.

126. Dobco incurred $14,987.82 in costs to retain Drobach. Id.

127. Although the Drobach invoices do not, on their face, describe items related to concrete, Mr. Johnson testified that Dobco used Drobach's equipment to complete work within J&A's scope. Tr. 69:3–6. J&A did not dispute that Dobco retained Drobach to complete work within J&A's scope.

128. The Court finds that Dobco incurred **$14,987.82** in costs to retain Drobach to perform work within J&A's scope.

**Herc**

129. Dobco rented equipment, including portable heaters and telehandlers, from Herc Rentals ("Herc"). Ex. D-83; Tr. 67:5.

130. Dobco incurred $229,841.40 in costs to retain Herc. Ex. D-83.

131. Although the invoices do not, on their face, describe items related to concrete, Mr. Johnson testified that Dobco used Herc's equipment to complete work within J&A's scope. Tr. 69:3–6. Mr. Johnson did not, however, identify which items listed on the invoices corresponded to concrete-related work.

132. J&A contends that the equipment Dobco rented from Herc, such as portable heaters and telehandlers, fell outside J&A's scope. Mr. Martins testified that telehandlers, which are "forklifts with expandable booms that . . . allow them to project materials," are used for material elevation and

lifting. Tr. 517:22–518:3. Mr. Martins further testified that the building concrete work was substantially completed before the dates shown on the Herc invoices. Tr. 501:2–502:2.

133. Mr. Martins further testified that the Herc invoices for portable heaters and ductwork appeared to be for the entire Project, not merely concrete-specific work. Tr. 516:17–518:14. Although Mr. Martins acknowledged that portable heaters may be used to provide heat for concrete workers during the winter, he testified that the scope and length of the heating Dobco rented was too great to provide heat for only a single trade. Tr. 598:10–599:16.

134. Dobco offered no evidence identifying which portion of equipment rented from Herc, including the heaters, was used to perform work within J&A's scope.

135. On this record—Herc's invoices, Dobco's cost records, and the trial testimony—the Court cannot determine, even approximately, what portion of Herc's charges was attributable to work within J&A's scope. The Court therefore declines to award the $229,841.40 Dobco paid to Herc.

**Hilti**

136. Dobco rented masonry equipment and tools from Hilti Corporation ("Hilti"). Ex. D-84.

137. Dobco incurred $15,236.93 in costs to rent masonry equipment and tools from Hilti. Id.

138. Hilti's invoices itemize the equipment, tools, and materials supplied—drill bits, blowout pumps, hammer drills, and mortar materials. Ex. D-84. These are items used in and around cast-in-place concrete work. Mr. Johnson testified that Dobco used Hilti's equipment in completing J&A's scope of work, Tr. 67:17–18, 69:3–6, and J&A offered no evidence that any portion of Hilti's charges fell outside J&A's scope.

139. The Court finds that Dobco incurred **$15,236.93** in costs to retain Hilti to perform work within J&A's scope.

### 2. Materials and Supplies

#### CASA Redimix Concrete Corp.

140. Dobco retained CASA Redimix Concrete Corp. ("CASA") to supply the concrete used to complete J&A's scope of work. Tr. 67:8–10; Tr. 68:20–21 (Johnson describing CASA as the "actual concrete material supplier that provided the concrete in place"); Ex. D-77.

141. Dobco incurred $175,099.19 in costs for concrete supplied by CASA. Ex. D-77.

142. Because the concrete CASA supplied was used to perform concrete work within J&A's scope, see supra ¶ 112, the Court finds that Dobco incurred **$175,099.19** in CASA costs to complete J&A's scope of work.

#### All Services Contractors Equipment and Bendall

143. Dobco hired All Services Contractors Equipment ("All Services") and Bendall Industries Inc. ("Bendall") to supply materials for the Project. Exs.

D-74, D-75. Dobco incurred $168.25 in costs to retain All Services and $9,158 in costs to retain Bendall. Exs. D-74, D-75.

144. Neither vendor's records identify the use to which the purchased materials were put; All Services's invoice describes the item supplied only as "Belt." Ex. D-74 at -1342. Mr. Johnson testified that the vendors listed in Ex. D-174, which include All Services and Bendall, supplied materials Dobco required to complete J&A's scope of work. Tr. 66:16–22. J&A did not cross-examine any witness about these vendors and offered no evidence that their charges fell outside J&A's scope. Mr. Johnson's testimony was unrebutted and the Court credits it.

145. The Court finds that Dobco incurred **$168.25** in All Services costs and **$9,158** in Bendall costs to complete J&A's scope of work.

**Glenwood Mason Supply Co., Inc.**

146. Dobco purchased masonry supplies from Glenwood Mason Supply Co., Inc. ("Glenwood"). Ex. D-82.

147. Dobco incurred $5,662.84 in costs to retain Glenwood. Id.

148. The invoices Dobco received from Glenwood specify that Dobco purchased "Portland Cement" from Glenwood. See generally Ex. D-82.

149. Because Portland cement is a material used in concrete work within J&A's scope, the Court finds that Dobco incurred **$5,662.84** in Glenwood costs to complete J&A's scope of work.

**Kamco**

150. Dobco purchased supplies from Kamco Supply ("Kamco"). Tr. 67:23; Ex. D-89.

151. Dobco incurred $35,252.38 in costs from purchasing supplies from Kamco. Ex. D-89.

152. The testimony concerning Kamco's supplies was conflicting and inconclusive as to whether any of them related to J&A's scope of work. Mr. Martins testified that Kamco supplies, such as Thermafiber rigid insulation would have been used for drywall work, which was outside J&A's scope. Tr. 520:21–521:9.

153. Mr. Mladenovic, by contrast, testified that the same Thermafiber material "could also be the rigid insulation that is commonly used in concrete work," Tr. 398:2–3, but was unable to state whether any particular Kamco invoice reflected supplies used for work within J&A's scope:

> Q. It's correct that this invoice is for drywall angles and Thermafiber material for the installation of drywall work, is that right?
>
> A. I don't know. Let me just check this. Can you repeat the question, please?
>
> Q. It's correct that this invoice is for drywall material, drywall angles and Thermafiber specifically?
>
> A. I don't know what the purpose of the material, but it looks like it's two-by-two by ten angle, 20-gauge, and Thermafiber two-inch by—so that seems to me like it's insulation, not necessarily drywall you're referring to.
>
> Q. But related to drywall work, correct?

A. I don't know that.

Tr. 397:12–24.

154. Neither witness could identify what portion of Kamco's charges, if any, was attributable to work within J&A's scope.

155. On this record—Kamco's invoices, Dobco's cost records, and the trial testimony—the Court cannot determine, even approximately, what portion, if any, of Kamco's charges was attributable to work within J&A's scope. The Court therefore declines to award the $35,252.38 Dobco paid to Kamco.

**Power Fast Construction**

156. Dobco purchased supplies from Power Fast Construction ("Power Fast"). Tr. 67:23; Ex. D-90.

157. Dobco incurred $21,934.22 in costs from purchasing supplies from Power Fast. Ex. D-90.

158. Power Fast's invoices include descriptions for items that are not facially related to concrete, such as trim nails, painter's tape, a laser level, and rain gear. Ex. D-90 at -67252, -67243, -67258, -67259.

159. Mr. Martins testified that these items would likely be used for work unrelated to concrete. Tr. 523:15–525:14.

160. Dobco provided no evidence, either in documents or testimony, explaining what portion of Power Fast's charges, if any, was attributable to J&A's scope of work.

161. On this record—Power Fast's invoices, Dobco's cost records, and the trial testimony—the Court cannot determine, even approximately, what

portion, if any, of Power Fast's charges was attributable to work within J&A's scope. The Court therefore declines to award the $21,934.22 Dobco paid to Power Fast.

**Thompson Materials**

162. Dobco hired Thompson Materials ("Thompson") to supply rebar materials needed to reinforce the concrete that Dobco was installing to complete J&A's scope of work. Tr. 67:23–24; Ex. D-92.

163. Dobco incurred $163,029.30 in costs purchasing rebar materials from Thompson. Ex. D-92.

164. The Court finds that Dobco incurred **$163,029.30** in costs to purchase rebar materials from Thompson to perform work within J&A's scope.

**Tilcon**

165. Dobco purchased construction materials from Tilcon. Tr. 67:25; Ex. D-93.

166. Dobco incurred $89,996.75 in costs purchasing materials from Tilcon. Ex. D-93.

167. Tilcon's invoices identify the materials supplied by industry designation—for example, "ASTM #57 3/4," see, e.g., Ex. D-93 at -67157—without stating the use to which each delivery was put. The designations identify standard construction aggregates.

168. Mr. Johnson identified Tilcon as among the suppliers from which Dobco purchased materials required to complete J&A's scope of work. Tr.

67:23–25; see also Tr. 66:16–22. He gave the same testimony as to Thompson, whose rebar the Court has found was supplied for work within J&A's scope. See supra ¶¶ 162–64. J&A did not examine any witness about Tilcon, did not identify any Tilcon invoice as unrelated to concrete, and offered no evidence that any portion of Tilcon's charges fell outside J&A's scope. Mr. Johnson's testimony was unrebutted and the Court credits it.

169. The Court finds that Dobco incurred **$89,996.75** in costs to retain Tilcon to perform work within J&A's scope.

**White Cap**

170. Dobco purchased construction materials from White Cap. Tr. 68:4–8; Ex. D-94.

171. Dobco incurred $98,514.63 in costs purchasing materials from White Cap. Ex. D-94.

172. Mr. Johnson testified that Dobco purchased rebar, formwork, and formwork curing agents from White Cap. Tr. 68:4–8. Each of those materials is used in cast-in-place concrete work, which was within J&A's scope under Article 8.1.1 of the Subcontract and Section 03 30 00 of the Project Specifications. See supra ¶ 112. Mr. Johnson's testimony was directed to White Cap specifically and identified the categories of material supplied; it was not a summary characterization of a vendor list. See supra ¶¶ 110–11.

173. Numerous White Cap invoices corroborate that testimony on their face, including invoices for "quikrete," "lightweight concrete mix," "weldcrete,"

"brick concrete," and rebar. See, e.g., Ex. D-94 at -67285, -67286, -67289, -67301, -67302, -67303, -67308, -67312, -67315.

174. J&A did not examine any witness about White Cap, did not identify any White Cap invoice as unrelated to concrete, and offered no evidence that any portion of White Cap's charges fell outside J&A's scope. Mr. Johnson's testimony was unrebutted and the Court credits it.

175. The Court finds that Dobco incurred **$98,514.63** in costs to retain White Cap to perform work within J&A's scope.

**3. Transportation and Storage**

**A&J Cianciulli and Able Rigging**

176. Dobco retained A&J Cianciulli ("A&J"), which operated a storage yard, to store a generator that Dobco could not yet install because J&A's abandonment of the Project had delayed completion of the concrete generator pad on which the generator was to rest. Tr. 143:17–24 (Johnson discussing A&J's role moving generator and attributing cost to J&A's abandonment).

177. Constructing the concrete generator pad was within J&A's scope of work. Tr. 382:21–25 (Mladenovic testifying that although the generator itself was outside J&A's scope, "the generator pad on which [the generator] rests is within J&A's scope").

178. Dobco incurred $60,000 in costs to store the generator at A&J's storage yard. Tr. 66:23–67:4; Tr. 383:17–384:7; Ex. D-189 (A&J invoice).

179. A&J sold its yard while the generator was stored there, which required Dobco to move and store the generator at another location. Tr. 143:17–24.

180. Dobco hired Able Rigging ("Able") to: (i) transport the generator from A&J's yard to Able's yard; (ii) store the generator until Dobco could install it; (iii) transport the generator from Able's yard to the Project; and (iv) rig the generator and lift it onto the concrete pad with a crane. Tr. 66:23–67:4, 383:17–384:7 (Mladenovic testifying that "Able Rigging was hired to rig the generator to be set on the generator pad, which should have been completed earlier but wasn't"); Ex. D-72.

181. Dobco incurred $55,648 to retain Able. Ex. D-72.

182. Dobco would not have incurred the costs of hiring A&J to store the generator but for J&A's failure to complete the generator pad, which was within the scope of J&A's work. Mr. Mladenovic explained that:

> the generator pad wasn't performed at the time when it should have been performed, that the rigging of the equipment was tied to rigging of other equipment on the project. So this cost we incurred because the rigging had to happen a second time because the concrete pad, which J&A failed to install at the right time, caused additional cost.
>
> Tr. 383:3–9.

183. The Court finds that Dobco incurred **$60,000** in storage costs to A&J as a result of J&A's default.

184. Able performed four services: it transported the generator from A&J's yard to its own, stored the generator, transported it to the Project, and rigged it onto the concrete pad. See supra ¶ 180. The relocation from A&J's yard was occasioned by A&J's sale of its facility rather than by J&A's default, and is not recoverable. The remaining three services were necessary because the generator pad was not completed when the Project schedule required, and their cost is attributable to J&A's default.

185. Able's invoice states a single charge for all four services. Ex. D-72. No witness apportioned among them, and the record supplies no basis—no separate pricing, no rate, no comparison to the A&J engagement—from which the Court could estimate what portion of the $55,648 is attributable to the relocation and what portion to the services J&A's default made necessary. The Court is unable to fix the recoverable amount with reasonable certainty and therefore declines to award the $55,648 Dobco paid to Able.

**Johns Transportation II Inc.**

186. Dobco retained Johns Transportation II Inc. ("JTI") to move Dobco's heavy equipment to and from the Project site. Tr. 67:5–7; Ex. D-87.

187. JTI's invoices do not distinguish between charges for transporting heavy equipment used to complete work within the scope of the Subcontract and other work outside the scope of the Subcontract. Ex. D-87.

188. Dobco incurred $27,226.09 in costs paid to JTI. Id.

189. No witness was able to identify what portion of JTI's charges was attributable to work within J&A's scope. Mr. Johnson testified only that he recognized JTI as "a transportation company, which is moving the big equipment back and forth between [Dobco's] yard and . . . the job site." Tr. 67:5–7.

190. On this record—JTI's invoices, Dobco's cost records, and the trial testimony—the Court cannot determine, even approximately, what portion, if any, of JTI's charges was attributable to work within J&A's scope. The Court therefore declines to award the $27,226.09 Dobco paid to JTI.

**D&A Contracting**

191. Dobco hired D&A Contracting ("D&A") to perform certain trucking work necessary to bring materials to the Project site. Tr. 67:12; 68:14–18; Ex. D-79.

192. Dobco incurred $190,367.26 in costs paid to D&A. Ex. D-79.

193. No witness was able to identify what portion of D&A's charges was attributable to work within J&A's scope. Mr. Johnson testified only that D&A "was a trucking company that would have been used to either bring in and haul away, bring in stone and haul away excavated materials," Tr. 68:14–18, and that "[p]erhaps D[&]A was one of the companies that . . . could have taken away some of the heavier debris," Tr. 137:25–138:6.

194. On this record—D&A's invoices, Dobco's cost records, and the trial testimony—the Court cannot determine, even approximately, what portion, if

any, of D&A's charges was attributable to work within J&A's scope. The Court therefore declines to award the $190,367.26 Dobco paid to D&A.

**Impact Environmental**

195. Dobco hired Impact Environmental to handle certain soil disposal needs caused by J&A's abandonment of the Project and the resulting delay in completing the concrete work. Tr. 141:18–142:7.

196. Because J&A's abandonment delayed completion of the concrete work, Dobco was required to refill certain holes so that other subcontractors could perform their work. Id.

197. Impact Environmental removed excess materials generated by the backfilling and re-excavating made necessary by delays in the concrete work. Id.

198. Dobco incurred $34,770.40 in costs paid to Impact Environmental. Ex. D-85.

199. Because Impact Environmental was retained to dispose of soil generated by the backfilling and re-excavation that J&A's abandonment and the resulting delay in the concrete work made necessary, the entirety of Impact Environmental's charges is attributable to J&A's default. Ex. D-85; Tr. 142:8–15. The Court finds that Dobco incurred **$34,770.40** in soil-disposal costs as a result of J&A's default.

### 4. Subcontractors Performing Completion Work

#### Cardella

200. Dobco hired Cardella Waste ("Cardella") to provide waste disposal and concrete washout services for the work Dobco performed to complete J&A's remaining scope of work on the Project. Tr. 389:16–390:3; Ex. D-76.

201. General waste disposal was not within J&A's scope of work under the Subcontract. Tr. 138:11–15 ("Construction debris, your Honor, was not [included in the J&A contract].").

202. No witness was able to identify what portion of Cardella's charges was attributable to work within J&A's scope. Mr. Johnson testified that Cardella removed both general construction debris—which was not within J&A's scope—and concrete debris, and that he could not say what proportion of Cardella's work fell into either category:

> Q. And you used Cardella Trucking to remove all construction debris and all other types of regular waste from the project, is that correct?
>
> A. We use Cardella for the majority of those reasons, yes, but we've also used some others for removal of say concrete debris.
>
> Q. And the removal of construction and demolition debris by Cardella, that was in support of the entire project, not just the concrete subcontract, is that correct?
>
> . . .
>
> A. Not solely Cardella.
>
> Q. But it did use Cardella?

> A. For some portions, yes.
>
> Q. What percentage of construction debris removal was Cardella['s]?
>
> A. I don't know.
>
> Q. Was it more than half?
>
> A. I don't know.
>
> Q. You don't have any recollection?
>
> A. The regular construction debris was probably the majority of it—probably the vast majority was Cardella. The demolition debris was probably a mix of Cardella and others . . . .
>
> Tr. 136:19–137:19.

203. Approximately half of Cardella's invoices are for "Asphalt/Concrete/Brick/Dirt (Mix)." See Ex. D-76.

204. Although the "Mix" invoices encompass materials beyond concrete, they represent the subset of Cardella's charges most closely associated with concrete work, and thus with work within J&A's scope. Given that Dobco has established it incurred some cost removing concrete debris in completing J&A's scope of work, the Court finds the Mix invoices a reasonable approximation of that cost.

205. Dobco incurred $77,517.45 in costs paid to Cardella. Ex. D-76.

206. The Court finds that the value of the invoices for "Asphalt/Concrete/Brick/Dirt (Mix)" is a reasonable approximation of the portion of Cardella's work dedicated to completing J&A's scope of work. The sum of Cardella's invoices for "Asphalt/Concrete/Brick/Dirt (Mix)" is $40,208.50.

207. The Court finds that Dobco incurred **$40,208.50** in costs to retain Cardella to perform work within J&A's scope. The Court finds that the remainder of the costs paid to Cardella—$37,308.95—falls outside the scope of J&A's work.

### Doka USA

208. Dobco hired Doka USA ("Doka") to supply specialized formwork necessary to complete concrete work. Tr. 67:10–15 ("So this would be the form work we had to use to perform the concrete work, which in this case because of the specialized form work needed, we rented the Doka USA formwork."); Ex. D-80 (Doka invoices).

209. Dobco incurred $52,689.24 to purchase formwork from Doka. Ex. D-80.

210. The Court finds that Dobco incurred **$52,689.24** in costs to retain Doka to perform work within J&A's scope.

### J&F Concrete Pumping

211. Dobco hired J&F Concrete Pumping ("J&F") to perform certain concrete-pumping work. Tr. 67:18–19; Ex. D-86.

212. Dobco incurred $48,604.43 to retain J&F for concrete-pumping work. Ex. D-86.

213. The Court finds that Dobco incurred **$48,604.43** in costs to retain J&F to perform work within J&A's scope.

### 5. Subcontractors Performing Remedial Work

### Construction Resource Services

214. Dobco hired Construction Resource Services ("CRS") to remediate and repair the cast-in-place foundation wall in the stress-relief area of the building after the Owner deemed J&A's work on that part of the Project noncompliant. Ex. D-78 (CRS invoice).

215. The cast-in-place foundation wall in the stress-relief area of the building was within J&A's scope of work under the Subcontract. Ex. D-3 § 8.1.1; Ex. D-5; Tr. 394:6–21 (Mladenovic discussing CRS).

216. J&A constructed the stress-relief-area foundation wall. Tr. 394:7–12. BIG, the Project architect, determined that J&A's work on that wall was noncompliant. Id.

217. Because J&A had abandoned the Project and the Subcontract had been terminated, J&A did not and would not correct the noncompliant work. Dobco therefore retained CRS to remediate and repair the wall. Tr. 394:6–21; Ex. D-78.

218. Dobco incurred $79,380 in costs to retain CRS to perform this corrective work. Ex. D-78.

219. The Court finds that the **$79,380** Dobco paid CRS to remediate the noncompliant foundation wall was a cost incurred as a result of J&A's default and its failure to perform work within its scope in a compliant manner.

**JP Hogan Coring & Sawing Co.**

220. Dobco retained JP Hogan Coring & Sawing Co. ("JP Hogan") to saw-cut and remove sections of concrete that J&A had previously placed and that were determined to be noncompliant and in need of replacement. Ex. D-88; Tr. 67:19–22.

221. Because J&A had abandoned the Project and the Subcontract had been terminated, J&A did not and would not correct the noncompliant work.

222. Dobco incurred $22,158.66 in costs to retain JP Hogan to perform this corrective work. Ex. D-88.

223. The Court finds that the $**22,158.66** Dobco paid JP Hogan to saw-cut sections of concrete previously done by J&A was a cost incurred as a result of J&A's default and its failure to perform work within its scope in a compliant manner.

**Yorie Tile & Terrazzo Inc.**

224. Dobco hired Yorie Tile & Terrazzo Inc. ("Yorie") to level a floor that J&A installed that was out of tolerance. Tr. 68:1–3.

225. Dobco incurred $37,116 in costs to retain Yorie to perform this corrective work. Exs. D-95, D-96.

226. J&A installed the floor that Yorie later leveled. That floor was within J&A's scope of work under the Subcontract. J&A installed it out of tolerance, which necessitated the corrective leveling Yorie performed.

227. Mr. Martins testified that the work performed by Yorie and work related to terrazzo generally is outside the scope of the concrete subcontract. Tr. 528:2–4.

228. Although Mr. Martins testified that terrazzo work generally falls outside the scope of the concrete subcontract, the cost at issue is not the cost of terrazzo work as such. Yorie was retained to level a floor that J&A had installed within its scope of work and had installed out of tolerance. The cost of correcting J&A's defective in-scope work is recoverable regardless of whether terrazzo finishing would independently have fallen within J&A's scope. See Ex. D-3 §§ 3.5.1, 7.1.2.

229. The Court finds that the **$37,116** Dobco paid Yorie to level the floor that J&A had installed was a cost incurred as a result of J&A's default and its failure to perform work within its scope in a compliant manner.

* * *

230. In sum, Dobco sought $1,592,326.83 in vendor, supplier, and subcontractor costs. That figure does not match the sum of the individual invoices in Schedule A to Dobco's proposed findings of fact and conclusions of law ($1,599,397.01), and neither figure matches the total of Dobco's cashed checks ($1,573,616.71). The Court caps recovery at the amount sought and measures each awarded cost by the check actually paid. The cashed checks establish $1,573,616.71 actually paid, and Dobco did not show that the remaining $18,710.12 was paid at all. For the reasons set forth above, the Court finds that

Dobco established $973,735.16 as costs incurred to complete J&A's scope of work or otherwise incurred as a result of J&A's default, and declines to award the $618,591.67 balance.[4] The following chart summarizes the Court's findings as to each vendor:

| Vendor | Amount Spent by Dobco | Amount Disallowed | Incurred by Dobco as a Result of J&A's Default |
|---|---|---|---|
| Ahern | $13,482.38 | $2,303.25 | $11,179.13 |
| Sunbelt | $15,775.09 | $0 | $15,775.09 |
| Drobach | $14,987.82 | $0 | $14,987.82 |
| Herc | $229,841.40 | $229,841.40 | $0 |
| Hilti | $15,236.93 | $0 | $15,236.93 |
| CASA | $175,099.19 | $0 | $175,099.19 |
| All Services | $168.25 | $0 | $168.25 |
| Bendall | $9,158.00 | $0 | $9,158.00 |
| Glenwood | $5,662.84 | $0 | $5,662.84 |
| Kamco | $35,252.38 | $35,252.38 | $0 |
| Power Fast | $21,934.22 | $21,934.22 | $0 |
| Thompson | $163,029.30 | $0 | $163,029.30 |
| Tilcon | $89,996.75 | $0 | $89,996.75 |
| White Cap | $98,514.63 | $0 | $98,514.63 |

4 Dobco sought $618,591.67, of which the cashed checks establish $599,881.55 was paid.

| | | | |
|---|---|---|---|
| A&J | $60,000.00 | $0 | $60,000.00 |
| Able | $55,648.00 | $55,648.00 | $0 |
| JTI | $27,226.09 | $27,226.09 | $0 |
| D&A | $190,367.26 | $190,367.26 | $0 |
| Impact Environmental | $34,770.40 | $0 | $34,770.40 |
| Cardella | $77,517.45 | $37,308.95 | $40,208.50 |
| Doka | $52,689.24 | $0 | $52,689.24 |
| J&F | $48,604.43 | $0 | $48,604.43 |
| CRS | $79,380.00 | $0 | $79,380.00 |
| JP Hogan | $22,158.66 | $0 | $22,158.66 |
| Yorie | $37,116.00 | $0 | $37,116.00 |
| **Total** | **$1,573,616.71** | **$599,881.55** | **$973,735.16** |

231. Dobco bore the burden of proving with reasonable certainty that a given cost was incurred to complete J&A's scope of work or as a result of J&A's default, and the question in every instance was whether the record permitted the Court to find, at least approximately, that some identifiable portion of a vendor's charges answered that description. Where a vendor supplied materials or services that were themselves within J&A's scope, the invoices resolved the question on their face, and the Court has awarded those costs in full—as with the concrete, cement, reinforcing steel, formwork, and pumping furnished by CASA, Glenwood, Thompson, Doka, Hilti, and J&F. Where a vendor was engaged to correct defective work that J&A had performed within its scope, or was engaged because J&A's abandonment delayed work J&A should have

completed, the engagement itself supplied the connection, and the Court has likewise awarded those costs in full—as with CRS, JP Hogan, Yorie, A&J, and Impact Environmental. Where the invoices did not resolve the question but a witness with knowledge testified that the vendor's equipment or materials were used to complete J&A's scope of work, and nothing in the record gave the Court reason to doubt that account, the Court has credited it—as with Sunbelt, Drobach, Tilcon, White Cap, All Services, and Bendall. Such testimony is evidence, and Dobco was entitled to carry its burden with it. See infra ¶ 302. Where the invoices disclosed charges both within and outside J&A's scope, the Court has awarded the portion the record permitted it to identify and no more—as with the "Asphalt/Concrete/Brick/Dirt (Mix)" invoices of Cardella, and the single Ahern invoice for equipment used before J&A left the site. Where the Court could not determine, even approximately, what portion of a vendor's charges was attributable to work within J&A's scope, it has awarded nothing because there was insufficient evidence from which to conclude that the expenses were incurred as a result of J&A's breach of contract.

232. Accordingly, the Court finds that Dobco incurred **$973,735.16** in recoverable vendor, supplier, and subcontractor costs to complete J&A's scope of work.

233. Therefore, the Court finds that Dobco sustained a total of **$2,502,326.87** in costs for labor, equipment, and vendors to complete J&A's scope of work.

## XIII. Dobco Incurred Delay Damages

### A. J&A's Subcontract Termination Resulted in a 299-Day Delay to the Project Schedule

234. J&A's purported termination of the Subcontract directly resulted in a 299-calendar-day period from May 24, 2021, through March 18, 2022, during which no concrete work was performed on the Project, delaying the Project's critical path and causing cascading delays to all successor activities. Ex. D-35 (October 28, 2022 Owner analysis attributing 299 days of delay to J&A's abandonment of the Project). Those 299 days of delay imposed costs on Dobco for which J&A is responsible and which Dobco cannot recover from the Owner.

235. In October 2022, Dobco submitted a request to the Owner for an extension of time to perform the Prime Contract, seeking 331 days of additional "Contract Time" as a result of certain delays encountered on the Project that occurred during, among other times, the period between J&A's last date of performing work on the Project (May 24, 2021) and the date concrete work resumed on the Project (March 18, 2022). Ex. D-35.

236. The Owner issued a Certificate for Partial Exceptional Time Extensions #2 ("Time Extension Certificate #2"), which indicated that "this contract time extension will automatically cease and terminate on the day prior to substantial completion of the contract (or final completion if no substantial completion)." Ex. D-34.

237. Time Extension Certificate #2 also provided that:

> [t]he City of New York grants this extension so as to expedite payment to the Contractor and does not Waive or release any claim it may have against the Contractor, whether it be for actual or liquidated damages for any reason whatsoever. Also, it is understood that the time extension is granted only for the purpose of Permitting continuation of contract performance.
>
> Id.

238. Mr. Mladenovic testified that Time Extension Certificate #2 was "issued by the [Owner] to allow the administrative process to continue as [Dobco] completed the work" and to "allow for [Dobco's] progress billings to take place without interruption." Tr. 285:10–15.

239. Mr. Mladenovic further testified that Time Extension Certificate #2 provided that the Owner was not releasing Dobco from any claim the Owner may have against Dobco for delays it or its subcontractors caused on the Project. Tr. 284:6–25, 286:1–12.

240. In a memorandum dated October 28, 2022, the Owner specifically found that J&A's abandonment of the Project had caused 299 days of delay to the Project:

> The project was delayed due to the General Contractor (DOBCO) defaulting their concrete subcontractor, J&A Concrete Corporation. DOBCO and their bonding company, ARCH Insurance, encountered difficulties securing a replacement subcontractor. After a number of attempts to hire replacement concrete subcontractors failed, DOBCO and their bonding company agreed that DOBCO would self perform the work. J&A's last day on site prior to their default was May 24th 2021;

> concrete work did not resume on site until March 18th 2022. Without a concrete subcontractor construction of grade beams, pile caps and stormwater detention tanks and other concrete work was delayed, in turn delaying overall project progress and completion. This resulted in a total of **299 [construction calendar days]** of delay to the project.
>
> Ex. D-35.

241. Because the Owner attributed the full 299 calendar days of delay to J&A, Dobco cannot recover any costs associated with those delays from the Owner. Tr. 287:1–16.

242. Three of the Owner's representatives signed the October 28, 2022 memorandum: Robert Petroff, the on-site representative for the Owner; Kevin Arscott, the Program Director; and Judith Bernard, the Associate Commissioner responsible for the New York Police Department construction program. Ex. D-35; <u>see also</u> Tr. 154:23–155:3.

243. No concrete work was performed on the Project during the 299-day period between J&A's final day of work on the Project, May 24, 2021, and the date concrete work resumed, March 18, 2022. Ex. D-35; <u>see also</u> Tr. 174:2–6 ("I'm familiar and aware that J&A had left the project in May of 2021, and that no concrete was performed from May of 2021 until March of 2022.").

244. At the outset of the Project, Dobco prepared a baseline schedule, also known as the "as-planned" schedule, which identified all of the Project activities that had to be completed between the first and last day of work on

the Project. Ex. D-136 (Project's original baseline schedule); Tr. 164:14–17; see also Tr. 163:1–8.

245. Dobco's Project Scheduler, Robert Valentin, maintained the Project schedule using a specialized software called Primavera P6 ("Primavera"). Tr. 181:18–182:2.

246. All activities added to the Project schedule in Primavera are logically interrelated. Mr. Valentin explained the relationship between activities on the Project schedule as follows:

> Q. And how do these [activities], if at all, connect to one another? Does the start and finish the date impact the total float? If so, how?
>
> A. Yeah, so all the activities are interrelated with some sort of logical designation, a driving predecessor or driving successor. As I mentioned, those last two columns that are identified as predecessor and successor, those are logic ties to other activities within the schedule. So if you are looking at one specific activity and you want to know what the successor is, by that activity ID designation in the successor column, you can find where that activity is in the schedule.
>
> Q. And if there's an adjustment made to a document like we're looking at now, how does that impact the rest of the document schedule?
>
> A. Yeah, so the schedule is very dynamic. So if an activity is adjusted, you know, where it basically shows an improvement to the projected date or shows a delay to the projected date, and it has successor logic ties to it, once that preceding activity moves or shifts left or

> right, it will designate and push any activity that has
> a relationship to it to a new date in the schedule.
>
> Tr. 168:2–22.

247. During the course of the Project, adjustments were made to the schedule. When adjustments were made, Primavera automatically updated the schedule based on related predecessor and successor activities. Tr. 182:7–11; Tr. 203:13–17.

248. Throughout the Project, Dobco provided the Owner with monthly updates regarding the Project using the "critical path method" or CPM (the "Monthly Schedule Updates"). Tr. 37:17–38:4.

249. The Project's critical path is the longest chain of dependent activities running through the Project's schedule. Thus, any delay to an activity on the critical path pushes out the completion date of the overall Project by the length of that delay. Tr. 232:15–19 ("THE COURT: The critical path is whatever project will take the longest so that it will be the last project completed? THE WITNESS: Yes. It's the longest chain of activities through the schedule that runs and generates what the project completion date would be.").

250. The Monthly Schedule Updates included the actualization of dates for completed work and the projections for completion dates of future work. Tr. 37:17–38:8.

251. To prepare the Monthly Schedule Updates, Mr. Johnson, Dobco's Project Executive, completed a questionnaire sheet provided by Dobco's Project Scheduler, Mr. Valentin, indicating the dates on which work had been

completed and projections for the completion of future activity. Tr. 37:17–38:8; Tr. 165:14–22.

252. When projecting future activities, Mr. Johnson would use information provided by Dobco's subcontractors or make best-guess projections based on his personal judgment. Tr. 151:9–16.

253. Because each individual Monthly Schedule Update was prepared using projected completion dates, the updates did not necessarily identify ultimate sources of delay. Tr. 168:23–169:15. Mr. Valentin testified as follows:

> Q. So looking at this document D-139, can somebody pick this up and determine what is delaying the project, if anything at all is delaying the project?
>
> A. Not really, no, because everything is projected, and until it's actually been actualized, you don't know. At that point, this is the current—what we knew as of May 31, 2021. So until those activities are 100 percent complete, you don't know the actual time frame of when those tasks actually occurred.
>
> Q. And when you say "actualized," what does that mean?
>
> A. Again, where we look through the schedule and identify, OK, yes, this activity started, so let's plug in and say, yeah, that it started on such and such a date. Once you do that, that letter A designation will pop up next to the date shown in the schedule, and it will be an actualized date. Same thing with finish dates. If you put in an actual finish, then the activity goes to 100 percent complete. That is [physically] locked into the schedule for the remainder of the project.
>
> Tr. 168:23–169:15.

254. After J&A ceased work on the Project, Dobco prepared its Monthly Schedule Updates using projections that assumed concrete work on the Project would resume promptly. Dobco made these projections based on its expectation that Arch would resolve Dobco's claim on the Bond promptly. Tr. 62:19–63:15; Tr. 184:12–23.

255. Monthly Schedule Update #35 was the first Monthly Schedule Update that Dobco issued after J&A abandoned the Project. Tr. 75:7–13.

256. Beginning with Monthly Schedule Update #35, Dobco prepared each subsequent Monthly Schedule Update by pushing the projected start date for the concrete work out by thirty days each month until the concrete work ultimately resumed on March 18, 2022. Tr. 60:24–61:12, Tr. 62:19–63:15.

257. Because the Monthly Schedule Updates beginning with Monthly Schedule Update #35 through March 18, 2022, inaccurately projected that concrete work would resume within thirty days, each Monthly Schedule Update during that period inaccurately reflected the effect of J&A's abandonment on the ultimate Project schedule. Tr. 60:24–61:12, 62:19–63:15; Tr. 184:12–185:4; Tr. 156:13–25; Tr. 231:24–232:19.

258. Mr. Valentin testified that he did not identify concrete work on the critical path in his Monthly Schedule Update narratives between May 31, 2021, and March 18, 2022, because Dobco assumed that Arch would promptly resolve Dobco's claim and supply a replacement concrete subcontractor imminently. Tr. 250:13–21.

259. The Owner did not accept any of Dobco's Monthly Schedule Updates or narratives between May 31, 2021, and March 18, 2022. Tr. 154:4–7.

260. Mr. Valentin testified that the Primavera scheduling software allows the scheduler to insert a placeholder in the schedule to indicate a period of time during which a designated activity is not progressing or will not progress until a designated date. Tr. 185:18–186:9.

261. At trial, Mr. Valentin entered a placeholder into the Primavera software in real time. The placeholder indicated that no concrete work occurred on the Project between May 24, 2021, and March 18, 2022. When Mr. Valentin ran the Primavera program with the input that no concrete work was actually performed from May 24, 2021, to March 18, 2022, the program showed that it was concrete work that became the critical path and ultimately delayed the Project. Tr. 198–202.

262. Mr. Valentin testified about his demonstration as follows:

> Q. And when you put in the fact that no concrete work was performed during the time period that the owner represented was not performed, what was the outcome?
>
> A. The concrete work then took over the critical path and it basically verified that that would have been the controlling critical path, resulting in months of project delay.
>
> Q. And I think you had said this before, and as a final question, why was that not reflected in all these other schedules contemporaneously?

> A. I believe at the time it was anticipated that J&A would be replaced fairly quickly, maybe four to six weeks, and if that was the case then it wouldn't have been driving if you knew you were going to have a concrete guy onboard four weeks after J&A left.
>
> . . .
>
> Q. And then when we now look back and see that all these projected dates turned out to be incorrect and concrete work did not begin until sometime after March 2022, how did that impact the schedule?
>
> A. It drives and delays all the work.
>
> Q. And that has nothing to do with the things that occurred before; right?
>
> A. Correct.
>
> Tr. 253:9–256:12.

263. Although J&A's designated scheduling expert, Feras A. Taher, testified that Dobco's contemporaneously prepared Monthly Schedule Updates never showed that concrete was the critical path, Tr. 627:23–628:8, Mr. Taher also acknowledged that his opinions would change "[i]f those schedules [were] deemed to be incorrect . . . based on . . . new information." Tr. 659:25–660:14.

264. Mr. Taher's conclusion that the contemporaneous Monthly Schedule Updates establish that concrete was not the driver of the critical path delay is afforded little weight in light of Mr. Valentin's and Mr. Johnson's credible testimony that the Monthly Schedule Updates inaccurately projected when concrete work would resume on the Project.

## B. Dobco Incurred Additional Field-Office Overhead Costs

265. Dobco incurred continuous field-office overhead costs over the course of the Project, including site supervision, miscellaneous equipment, office trailers, scheduling, portable toilets, fencing, storage containers, office supplies, and other related expenses. Tr. 294:23–295:10.

266. Dobco's recoverable field-office overhead costs are limited to those incurred during the period of delay attributable to J&A's default, as found below. See infra ¶ 290. As discussed above, the number of delay days attributable to J&A's abandonment of the Project is 299. See supra ¶ 234. This section establishes Dobco's daily field-office overhead costs.

### 1. Dobco's Site Supervision Costs

267. Dobco at all times maintained the following supervisors on site: (a) Project Executive; (b) Project Manager; (c) Project Engineer; (d) Quality Control supervisor; (e) safety supervisor; and (f) Project Superintendent. The individuals performing these roles varied over the course of the Project. Ex. D-100; see also Tr. 295:25–296:12.

268. In the course of its ordinary accounting practices, Dobco generated a spreadsheet identifying all supervisory personnel, along with their annual salaries, bonuses, reimbursements, fringe benefits, employer taxes, medical expenses, and hourly or daily rates. Ex. D-100; Tr. 368:8–14.

269. Dobco employed two Project Executives during the course of the Project: Mr. Mladenovic, whose adjusted daily rate was $468.65, and Mr. Johnson, whose adjusted daily rate was $905.30.[5] Ex. D-100.

270. Dobco's average daily cost to supply a Project Executive was **$686.98**. Id.

271. Dobco employed three Project Managers during the course of the Project: Javier Leibovic, whose adjusted daily rate was $593.63; Benjamin Mena, whose adjusted daily rate was $669.41; and Kenneth Pereira, whose adjusted daily rate was $493.22. Id.

272. Dobco employed one Senior Project Manager, Kris Lukowitz, whose adjusted daily rate was $655.66. Id.

273. Dobco's average daily cost to supply a Project Manager, including Senior Project Managers, was **$602.98**. Id.

274. Dobco employed two Project Engineers during the course of the Project: Yousef Elakbawy, whose adjusted daily rate was $388.51, and Chaseton Ennis, whose adjusted daily rate was $311.08. Id.

275. Dobco employed one Project Engineer Intern during the course of the Project: Omar Moussa, whose adjusted daily rate was $119.37. Id.

276. Dobco's average daily cost to supply a Project Engineer, including a Project Engineer Intern, was **$272.99**. Id.

---

5 The adjusted daily rate considers not only annual salaries, but also bonuses, reimbursements, fringe benefits, employer taxes, and medical expenses. Ex. D-100; Tr. 368:8–14.

277. Dobco employed one Quality Control supervisor during the course of the Project, James Philbin, whose adjusted daily rate was $399.32. Id. Dobco's average daily cost to supply a Quality Control supervisor was therefore $**399.32**. Id.

278. Dobco employed two safety supervisors during the course of the Project: Robert Carpenter, a Site Safety Director whose adjusted daily rate was $442.87, and Christopher Cavallo, a Site Safety Coordinator whose adjusted daily rate was $286.51. Id.

279. Dobco's average daily cost to supply a safety supervisor was **$364.69**. Id.

280. Dobco employed five Superintendents during the course of the Project: Vasilija Curovic, whose adjusted daily rate was $454.30; Christopher Greenwood, whose adjusted daily rate was $321.16; Edward Nolin, whose adjusted daily rate was $419.86; Milutin Stevanovic, whose adjusted daily rate was $552.39; and Greg Tejada, whose adjusted daily rate was $365.41. Id.

281. Dobco's average daily cost to supply a Project Superintendent was **$422.62**. Id.

282. Dobco's overall average daily cost for site supervision was **$2,749.58**. Id.

**2. Dobco's Owned-Equipment Costs**

283. Dobco maintained a backhoe, a Lull (i.e., a machine that combines the capabilities of a forklift and a crane), office trailers, a storage container,

and fencing to perform certain general project-related tasks. Ex. D-101; Ex. D-110; Tr. 303:9–20.

284. Based on the applicable Blue Book rates for the Dobco-owned equipment that Dobco supplied to perform general Project-related tasks, Dobco's daily cost to supply this equipment to the Project was $1,171.09:

| **Equipment** | **Blue Book Daily Rate** | **Exhibit** |
|---|---|---|
| John Deere Backhoe | $329.38 | Ex. D-101 |
| Lull – 10,000-lb Model 1044C-54 | $392.48 | Ex. D-101 |
| Office Trailer (10' x 50') | $35.36 | Ex. D-101 |
| Office Trailer (10' x 50') | $35.36 | Ex. D-101 |
| Office Trailer (10' x 50') | $35.36 | Ex. D-101 |
| Storage Container | $11.82 | Ex. D-101 |
| Fence | $331.33 | Exs. D-101, D-110 |
| | | **Total: $1,171.09** |

### 3. Dobco's Vendor and Subcontractor Costs

285. Dobco retained certain vendors whose services were required for the entire duration of the Project to provide scheduling, office supplies, portable toilets, trailers, dumpsters, professional services, and miscellaneous

equipment. Exs. D-102, D-103, D-104, D-105, D-106, D-107, D-108, D-109; see also Tr. 304:23–305:11, 305:20–24.

286. Although Dobco employed other vendors at certain times during the Project, vendors providing the foregoing services were required throughout the entire Project, and their costs therefore continued to accrue during periods of delay. Tr. 306:2–5, 306:10–15, 306:19–22 (Mladenovic discussing portable toilet costs); Tr. 307:3–23 (Mladenovic discussing field-office maintenance costs); Tr. 308:11–20 (Mladenovic discussing recurring photography costs); Tr. 308:24–309:5 (Mladenovic discussing various equipment costs); Tr. 309:10–12.

287. Dobco incurred a total daily cost of $1,653.50 to supply these vendors and subcontractors for the Project:

| **Category** | **Daily Rate** | **Exhibit** |
|---|---|---|
| Scheduling | $27.24 | Ex. D-102 |
| Office Expenses and Supplies | $267.48 | Ex. D-102 |
| Portable Toilets (Rental) | $74.96 | Ex. D-102 |
| Trailer (Rental) | $5.29 | Ex. D-102 |
| Dumpsters | $105.47 | Ex. D-102 |
| Professional Services | $635.28 | Ex. D-108; see also Tr. 308:4–20 |
| Equipment | $537.78 | Ex. D-102 |
| | | **Total: $1,653.50** |

### C. Dobco Incurred Costs Each Day the Project Was Delayed

288. Article 11.7 of the Standard Contract provides the following methodology by which delay costs are calculated on the Project:

> 11.7.1 Delay damages may be recoverable for the following costs actually and necessarily incurred in the performance of the **Work**:
>
> > 11.7.1.1 Direct labor, including payroll taxes (subject to statutory wage caps) and supplemental benefits, based on time and materials records;
> >
> > 11.7.1.2 Necessary materials (including transportation to the **Site**), based on time and material records;
> >
> > 11.7.1.3 Reasonable rental value of necessary plant and equipment other than small tools, plus fuel/energy costs according to the applicable formula outlined in Articles 26.2.4 and/or 26.2.8, based on time and material records;
> >
> > 11.7.1.4 Additional insurance and bond costs;
> >
> > 11.7.1.5 Extended **Site** overhead, field office rental, salaries of field office staff, on-site project managers and superintendents, field office staff vehicles, **Project**-specific storage, field office utilities and telephone, and field office consumables;
> >
> > 11.7.1.6 Labor escalation costs based on actual costs;
> >
> > 11.7.1.7 Materials and equipment escalation costs based on applicable industry indices unless documentation of actual increased cost is provided;

> 11.7.1.8 Additional material and equipment storage costs based on actual documented costs and additional costs necessitated by extended manufacturer warranty periods; and
>
> 11.7.1.9 Extended home office overhead calculated based on the following formula: (1) Subtract from the original **Contract** amount the amount earned by original contractual **Substantial Completion** date (not including change orders); (2) Remove 15% overhead and profit from the calculation in item (1) by dividing the results of item (1) by 1.15; (3) Multiply the result of item (2) by 7.25% for the total home office overhead; (4) Multiply the result of item (3) by 7.25% for the total profit; and (5) The total extended home office overhead will be the total of items (3) and (4).

Ex. D-1 § 11.7.

289. During each day of delay, Dobco incurred reasonable field-office overhead costs of $5,574.17:

| **Field Cost Category** | **Daily Cost** |
|---|---|
| Supervision | $2,749.58 |
| Owned Equipment | $1,171.09 |
| Vendors | $1,653.50 |
| Total Daily Field-Office Costs | $5,574.17 |

See supra Sections XIII.B.1–3.

290. Multiplying Dobco's reasonable field-office overhead costs of $5,574.17 per day by the 299 days of delay attributable to J&A's abandonment

of the Project yields $**1,666,676.83** in additional field-office overhead costs. Tr. 310:8–19.

### D. Dobco Incurred Additional Home-Office Overhead Costs

291. Dobco also incurred $2,040,592.63 in home-office overhead costs, calculated according to Article 11.7.1.9 of the Standard Contract:

| | |
|---|---|
| Original Prime Contract Value | $57,700,000.00[6] |
| Earned at Original Substantial Completion Date | $27,520,027.08[7] |
| (1) Difference | $30,179,972.92 |
| (2) Remove 15% overhead and profit[8] | $26,243,454.71 |
| (3) 7.25% for total home-office overhead[9] | $1,902,650.47 |
| (4) 7.25% for total profit[10] | $137,942.16 |
| (5) Total extended home overhead[11] | $2,040,592.63 |

292. The entire Project was delayed by 1,201 days, of which J&A was responsible for 299. Tr. 301:20–302:18.

6 Ex. D-4; Tr. 260:11–15.

7 Tr. 311:19–312:15.

8 The Standard Contract provides that this figure is calculated by "dividing the results of item (1) by 1.15." Ex. D-1 § 11.7.1.9(2).

9 The Standard Contract provides that this figure is calculated by multiplying "the result of item (2) by 7.25% for the total home office overhead." Id. § 11.7.1.9(3).

10 The Standard Contract provides that this figure is calculated by multiplying "the result of item (3) by 7.25% for the total profit." Id. § 11.7.1.9(4).

11 The Standard Contract provides that "[t]he total extended home office overhead will be the total of items (3) and (4)." Id. § 11.7.1.9(5).

293. J&A is responsible for 299 days' worth of extended home-office overhead costs out of 1,201 total days of delay—namely, **$508,024.31**. Tr. 312:25–313:9.

## CONCLUSIONS OF LAW

### XIV. Jurisdiction and Venue

294. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1). Dobco is a citizen of New Jersey; J&A is a citizen of New York; and the amount in controversy exceeds $75,000, exclusive of interest and costs. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because the Project is located in the Bronx, and therefore a substantial part of the events giving rise to the claims occurred in this District.

### XV. J&A Breached the Subcontract

295. To recover for breach of contract under New York law, a plaintiff must prove by a preponderance of the evidence: (1) the existence of a contract between the plaintiff and the defendant; (2) performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages to the plaintiff caused by the defendant's breach. Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y., 375 F.3d 168, 177 (2d Cir. 2004).

296. The Court entered summary judgment for Dobco as to liability, holding that Dobco had demonstrated (1) the existence of the Subcontract; (2) that Dobco performed its obligations under the Subcontract; and (3) that

J&A breached the Subcontract. J&A Concrete, 2025 WL 605252. The sole remaining issue is the extent of Dobco's damages.

## XVI. Damages

### A. The Measure of Damages

297. Under New York law, damages for breach of contract are intended to place the non-breaching party in the position it would have occupied had the contract been performed. Oscar Gruss & Son, Inc. v. Hollander, 337 F.3d 186, 196 (2d Cir. 2003) ("[D]amages for breach of contract should put the plaintiff in the same economic position he would have occupied had the breaching party performed the contract."). They are not intended to place that party in a better position than performance would have produced. The party seeking damages bears the burden of proving them with reasonable certainty. Boyce v. Soundview Tech. Grp., Inc., 464 F.3d 376, 391 (2d Cir. 2006).

298. "The proper measure of damages in a case such as this, where the contractor walked off the job after completing only a portion of the work required by his agreement is the difference between the contract price and the cost of completing the work left undone." Wolff & Munier, Inc. v. Whiting-Turner Contracting Co., 946 F.2d 1003, 1011 (2d Cir. 1991) (quoting Sarnelli v. Curzio, 479 N.Y.S.2d 257, 258 (App. Div. 1984)). "In practical application, however, the rule of damages is more clearly and appropriately stated to be the difference between the amount remaining due and owing under the original

agreement and the actual cost of completing the work required by the contract." Id.

299. "Although damages must be reasonably certain and such only as actually follow or may follow from the breach of the contract, certainty, as it pertains to general damages, refers to the fact of damages, not the amount." N.Y.C. Transit Auth. v. Express Scripts, Inc., 588 F. Supp. 3d 424, 442 (S.D.N.Y. 2022). A "plaintiff need only show a stable foundation for a reasonable estimate of the damage incurred as a result of the breach." Id.

300. "Courts in this Circuit have recognized that such an estimate necessarily requires some improvisation, and the party who has caused the loss may not insist on theoretical perfection." Id.

301. "When it is certain that damages have been caused by a breach of contract, and the only uncertainty is as to their amount, there can rarely be any good reason for refusing, on account of such uncertainty, any damages whatever for the breach. A person violating his contract should not be permitted entirely to escape liability because the amount of the damage which he had caused is uncertain." Lexington Prods., Ltd. v. B.D. Commc'ns, Inc., 677 F.2d 251, 253 (2d Cir. 1982) (quoting Randall-Smith, Inc. v. 43d St. Estates Corp., 215 N.E.2d 494, 498 (N.Y. 1966)).

302. "Proof of damages may be based on oral testimony as long as the witness has knowledge of the actual costs." Aniero Concrete Co. v. N.Y.C. Constr. Auth., No. 94-cv-9111, 2003 WL 21018842, at *3 (S.D.N.Y. May 5, 2003).

303. "If the party seeking damages has not set forth a reasonable estimate, however, under New York law, nominal damages are always available in a breach of contract action even if a party cannot prove damages." Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co., 976 F.3d 239, 248 n.10 (2d Cir. 2020).

304. Where the parties have prescribed a remedy by contract, that remedy governs. The Subcontract addresses precisely the circumstance presented here.

305. Article 7.1.2 of the Subcontract enumerates the damages that Dobco is entitled to recover as a result of J&A's breach:

> In the event of termination pursuant to this Section 7.2.1 [sic], the Contractor shall be entitled to recover from Subcontractor without limitation, all costs, losses, damages, penalties and fines incurred by the Contractor as a result of Subcontractor's Default, including without limitation those remedies and damages set forth in Section 3.5.1 and reasonable attorneys' fees and any home office or field office costs that arise out of or are related to any such Subcontractor's Default, failure to act, or any such omissions by the Subcontractor. If the unpaid balance of the Subcontract Sum exceeds the expense of finishing the Subcontractor's Work and all other losses, damages, penalties and fines incurred by the Contractor and not expressly waived, such excess shall be paid to the Subcontractor for the unpaid Work executed by the Subcontractor. If such expenses, losses, damages, penalties and fines of Contractor exceed such unpaid balance, the Subcontractor shall pay the difference to the Contractor.

Ex. D-3 at 13–14.

306. Article 3.5.1 of the Subcontract provides:

> If the Subcontractor defaults or neglects to carry out the Work in accordance with this Agreement and mutually agreed progress schedule and through no fault of Contractor and fails within five (5) business days after receipt of notice from the Contractor to commence and continue correction of such default or neglect with diligence and promptness, the Contractor may, without prejudice to other remedies the Contractor may have, including without limitation the Contractor's right to terminate this Subcontract pursuant to Section 7 hereof, order the Subcontractor to provide overtime or similar measures at Subcontractor's sole cost to make up schedule delays, or immediately make good such deficiencies and may deduct the reasonable cost thereof from the payment then or thereafter due the Subcontractor, including without limitation, reasonable attorney fees and any home office or field office costs that arise out of or are related to any such default, failure to act, or any such omission by the Subcontractor. If the cost of finishing the Work, including compensation for the Contractor's services and expenses made necessary thereby exceeds the unpaid balance hereunder, the Subcontractor shall pay the difference to the Contractor within seven business days of Contractor's demand for same.

Id. at 4–5.

307. Read together, Articles 7.1.2 and 3.5.1 entitle Dobco to recover from J&A (i) the cost to complete J&A's scope of work, (ii) reasonable field-

office overhead costs, (iii) reasonable home-office overhead costs, and (iv) reasonable attorney's fees.

308. Dobco substantiated that it suffered damages under the first three of the above categories through the testimony of Messrs. Mladenovic, Johnson, and Valentin, as well as documentary evidence, including payroll records, invoices, checks, correspondence, and schedules.

**B. The Subcontract Balance Available to Dobco Totaled $939,052.65**

309. The remaining Subcontract balance as of August 7, 2021—the date of the final concrete-related change order—was $1,783,353.49. See supra ¶¶ 47–49.

310. The Owner, through its construction manager, LiRo, prepared an estimate that valued the reduction of J&A's scope of work as a result of Bulletin 12 at $844,300.84. See supra ¶¶ 68, 72–73.

311. Article 2.1 of the Subcontract binds J&A to Dobco in the same manner that Dobco is bound to the Owner under the Prime Contract. See Ex. D-3 § 2.1.

312. Dobco provided LiRo's estimate to J&A and requested that J&A submit its own cost proposal for the concrete work that was removed by Bulletin 12. See supra ¶¶ 66, 69.

313. J&A failed to provide a cost proposal that LiRo would accept. Dobco was therefore bound by LiRo's estimate of $844,300.84. See supra

¶¶ 70–73, 77. After the Bulletin 12 adjustment, the remaining value of the Subcontract was $939,052.65.

**C. Dobco's Cost to Complete J&A's Scope of Work Was $2,502,326.87**

314. As a result of J&A's breach of the Subcontract, Dobco was required to (i) employ labor, (ii) use equipment, and (iii) procure materials and retain vendors.

315. Dobco's labor cost to complete J&A's scope of work was $1,389,788.41. See supra Section XII.A.

316. Dobco's cost to use its own equipment to complete J&A's scope of work was $138,803.30. See supra Section XII.B.

317. Dobco's cost to purchase materials and retain subcontractors and vendors to complete J&A's scope of work was $973,735.16. See supra Section XII.C.

318. Dobco paid an additional $599,881.55 to vendors (although it sought $618,591.67), which Dobco seeks as damages. For the reasons set forth above, see supra ¶¶ 119, 135, 155, 161, 185, 190, 194, 207, these additional charges are not properly included as damages resulting from J&A's breach of the Subcontract.

319. Dobco's total cost to complete J&A's scope of work is **$2,502,326.87**.

**D. Dobco Is Not Entitled to a Profit and Overhead Markup**

320. Dobco seeks a fifteen-percent markup for overhead costs and profit in the amount of $468,137.78. See ECF No. 238 at 2; Ex. D-172 at -1774.

321. Dobco seeks a five-percent profit component as part of its requested fifteen-percent markup. See ECF No. 238 at 2; Ex. D-172 at -1774.

322. Dobco's profit on the Project derived from the Prime Contract, not from the Subcontract. Under the Prime Contract, the Owner agreed to pay Dobco $57,700,000 to construct the Project. See supra ¶¶ 7–8. That price did not change as a result of J&A's default, and Dobco has identified no reduction in its Prime Contract recovery attributable to J&A's breach. To the contrary, the Owner attributed the entirety of the 299-day delay to J&A and granted Dobco a corresponding extension of time. See supra ¶¶ 236, 240–41.

323. Whether J&A performed the work or Dobco completed it, Dobco's Prime Contract margin was the same. J&A's breach therefore did not deprive Dobco of any profit.

324. What J&A's breach did impose on Dobco was the cost of completing work J&A had agreed to perform. The Court has accounted for those costs in calculating Dobco's damages. See supra Sections XII & XIII. Together with the credit for the unpaid Subcontract balance required by Section 7.1.2 and the Arch settlement, that award restores Dobco to the position it would have occupied had J&A performed. See infra ¶¶ 340–41. An additional profit markup would place Dobco in a better position than performance would have produced and would compensate a loss Dobco did not sustain.

325. The authorities on which Dobco relies do not hold otherwise. Those decisions address the measure of recovery available to a contractor seeking compensation for work it performed—a context in which overhead and profit are components of the reasonable value of the services rendered. See Najjar Indus., Inc. v. City of New York, 451 N.Y.S.2d 410, 412–13 (App. Div. 1982); Aniero Concrete Co. v. N.Y.C. Constr. Auth., 308 F. Supp. 2d 164, 207–08 (S.D.N.Y. 2003). Dobco is not seeking payment for services rendered to a paying party. It is seeking damages for breach by its own subcontractor, and it has already been compensated for what that breach cost it.

326. To the extent Dobco's request rests on a quantum meruit measure, that measure is unavailable. A party may not recover in quasi-contract where a valid and enforceable written contract governs the same subject matter. Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 516 N.E.2d 190, 193 (N.Y. 1987). The Subcontract governs, and it prescribes an express remedy.

327. Dobco's request for a ten-percent overhead component also fails for several reasons.

328. First, Dobco has not proven that it incurred any overhead expense beyond the home-office and field-office costs found above. Section 7.1.2 permits recovery of "home office or field office costs" that Dobco incurred as a result of J&A's default. Ex. D-3 § 7.1.2. By order dated July 20, 2026, the Court directed Dobco to identify the evidence in the record, if any, supporting its claim to an overhead and profit markup of $468,137.78. ECF No. 237. In response, Dobco identified no evidence of overhead expense other than the costs it proved

separately. Instead, it cited a deduct change order in which Dobco itself applied a fifteen-percent markup, change orders in which J&A sought a twenty-two-percent markup, and case law addressing the reasonableness of percentage markups. ECF No. 238 at 2. None of that is evidence that Dobco incurred overhead costs, in the claimed amount or in any amount. Dobco bore the burden of proving its damages with reasonable certainty, and as to the claimed overhead it offered no proof at all.

329. Second, and in any event, the requested markup duplicates costs the Court has separately awarded. Dobco acknowledges that "its claim includes extended home office costs incurred during the 299-day delay period," and asserts that this claim is "entirely separate from the overhead markup at issue here." ECF No. 238 at 2 n.1. It is not separate. A percentage markup for overhead is a proxy for costs that cannot readily be traced to a particular project—a substitute for proof, not an additional category of loss. Section 7.1.2 entitles Dobco to recover its home-office and field-office overhead costs as specified in that section, but only once.

330. Dobco's own description of the markup confirms the duplication. Dobco states that the markup compensates it for "the overhead and profit it is entitled to receive as a business entity for performing the work that J&A was obligated to perform," and that these costs "were incurred and are reimbursed as a percentage of direct costs." Id. Costs that were in fact incurred are provable, and Dobco has separately undertaken to prove them. The percentage adds nothing but a second recovery.

331. Third, the amount Dobco requests also does not correspond to the costs the Court has found. Dobco's requested markup of $468,137.78 reflects fifteen percent of a cost base of approximately $3,120,918.53. See ECF No. 238 at 2. The Court has found that Dobco incurred $2,502,326.87 in recoverable costs to complete J&A's scope of work. See supra ¶ 319. Even on Dobco's own theory, a markup could attach only to costs the Court has found proven.

332. For these reasons, the Court declines to award Dobco a fifteen-percent markup for overhead and profit and declines to award the $468,137.78 Dobco seeks on that basis.

**E. Dobco Suffered No Unrecovered Loss**

333. Applying the measure set out in Wolff & Munier—"the difference between the amount remaining due and owing under the original agreement and the actual cost of completing the work required by the contract," 946 F.2d at 1011—Dobco's damages are calculated as follows.

334. The Subcontract balance available to Dobco to complete J&A's scope of work was **$939,052.65**. See supra ¶ 313.

| **Subcontract Balance** | | |
|---|---|---|
| **Description** | **Value** | **Trial Exhibits** |
| Subcontract | $3,900,000 | Ex. D-3 |
| Approved Change Orders | $280,807.03 | Exs. D-41 to D-61, D-63 |
| Deductive Change Orders | ($181,423.11) | Exs. D-62, D-64 to D-67 |
| Paid to Date | ($2,216,030.43) | Joint Pretrial Order ¶ 7(f) |
| Bulletin 12 Reduction | ($844,300.84) | Ex. D-163 |
| | | **Subcontract Balance: $939,052.65** |

335. Dobco concedes that the $3,900,000 it received from Arch in settlement of its claim on the Bond is credited against the costs attributable to J&A's default. See supra ¶ 88. The Bond was security J&A was required to furnish as a condition of the Subcontract, running to Dobco's benefit and guaranteeing J&A's performance of the Work. See supra ¶ 17; Ex. D-3 § 12.2. Paragraph 6 obligated Arch, if it could not perform under paragraph 4 and Dobco completed the Work at a cost exceeding the Contract Price, to pay Dobco that excess up to the penal sum. See supra ¶ 20; Ex. D-10 ¶ 6. Arch was unable to tender a completion contractor at a price within the balance of the Subcontract, Dobco self-performed, and Arch paid the full penal sum. See supra ¶¶ 84–87. Damages for breach of contract restore the non-breaching party to the position it would have occupied had the contract been performed, not a better one. See supra ¶ 297. Having been paid that loss, Dobco may not recover it again from J&A.

336. The total cost to complete J&A's scope of work, together with the reasonable field-office overhead costs and home-office costs that Dobco incurred as a direct result of J&A's 299-day delay, was **$4,677,028.01**.

| **Total Recoverable Costs** | |
|---|---|
| Cost to Complete (labor, equipment, vendors) | $2,502,326.87 |
| Reasonable Home-Office Overhead Costs | $508,024.31 |
| Reasonable Field-Office Overhead Costs | $1,666,676.83 |
| | **Total**: **$4,677,028.01** |

337. Dobco is entitled to recover the cost to complete J&A's scope of work under Articles 3.5.1 and 7.1.2 of the Subcontract. That cost includes the labor Dobco employed, the subcontractors and vendors it retained, and the equipment it supplied. As the Court found above, to complete J&A's scope of work Dobco incurred **$1,389,788.41** for labor, supra Section XII.A; **$973,735.16** to retain subcontractors and vendors, supra Section XII.C; and **$138,803.30** to use its own equipment, supra Section XII.B. The total cost Dobco incurred to complete J&A's scope of work was therefore **$2,502,326.87**.

338. Article 7.1.2 entitles Dobco to recover "any home office . . . costs that arise out of or are related to" J&A's default. Ex. D-3 § 7.1.2; see also id. § 3.5.1. The Subcontract does not itself prescribe how those costs are to be quantified, but Article 2.1 binds J&A to Dobco in the same manner that Dobco is bound to the Owner under the Prime Contract, id. § 2.1, and Article 11.7.1.9 of the Standard Contract supplies a formula for extended home-office overhead. See Ex. D-1 § 11.7.1.9. That formula therefore supplies the measure of

the home-office costs recoverable under Article 7.1.2. Applying it, Dobco's extended home-office overhead costs were **$2,040,592.63**. See supra ¶ 291. The Project was delayed a total of 1,201 days, see supra ¶ 292, of which J&A is responsible for 299. J&A is accordingly responsible for **$508,024.31** of Dobco's extended home-office overhead costs. See supra ¶ 293.

339. Article 7.1.2 likewise entitles Dobco to recover "any . . . field office costs that arise out of or are related to" J&A's default. Ex. D-3 § 7.1.2; see also id. § 3.5.1. Articles 11.7.1.3 and 11.7.1.5 of the Standard Contract, which reach J&A through Article 2.1, identify the components of such costs: extended site overhead, the salaries of on-site project managers and superintendents, field-office rental and consumables, and the reasonable rental value of necessary plant and equipment. Ex. D-1 §§ 11.7.1.3, 11.7.1.5. As the Court found above, Dobco's daily costs in these categories were $2,749.58 for supervision, supra ¶ 282; $1,171.09 for Dobco-owned equipment, supra ¶ 284; and $1,653.50 for vendors supplying services required throughout the Project, supra ¶ 287. Dobco's average daily field-office overhead cost was therefore $5,574.17. Supra ¶ 289. Multiplied by the 299 days of delay attributable to J&A, that yields **$1,666,676.83** in recoverable field-office overhead costs. See supra ¶ 290.

340. The difference between the amount available under the Subcontract, including adjustments—$939,052.65—and the actual cost of completing J&A's scope of work plus reasonable home-office and field-office overhead costs—$4,677,028.01—is **$3,737,975.36**.

341. Because Dobco has received Arch's payment of $3,900,000, it has already received **$162,024.64** in excess of its damages.

342. Although Dobco suffered no unrecovered loss, "[i]t is a well settled tenet of contract law that even if the breach of contract caused no loss . . . the injured party is entitled to recover as nominal damages a small sum fixed without regard to the amount of loss, if any." Kozera v. Int'l Bhd. of Elec. Workers, AFL-CIO, 230 F. Supp. 2d 413, 424 (S.D.N.Y. 2002). Dobco is therefore entitled to nominal damages against J&A in the amount of $1.00. See Auwood v. Harry Brandt Booking Off., Inc., 850 F.2d 884, 892 (2d Cir. 1988) ("nominal damages are limited to sums that are de minimis, most commonly $1").

## XVII. Dobco May Move for Attorney's Fees

343. Article 7.1.2 of the Subcontract entitles Dobco to recover "all costs, losses, damages, penalties and fines incurred by [Dobco] as a result of [J&A's] Default, including without limitation . . . reasonable attorneys' fees . . . that arise out of or are related to any such . . . default, failure to act, or any such omissions by [J&A]." Ex. D-3 § 7.1.2. As a direct result of J&A's breach, Dobco was required to retain counsel to establish J&A's liability and to prosecute its breach-of-contract counterclaim in this litigation.

344. Dobco may therefore move for an award of reasonable attorney's fees under Article 7.1.2. Any such motion shall be filed within fourteen days after entry of judgment. See Fed. R. Civ. P. 54(d)(2)(B). The Court expresses no view on the reasonableness of any fees Dobco may seek.

## CONCLUSION

Although Dobco demonstrated that J&A breached the Subcontract, after taking into account the remaining Subcontract balance and the amount that Dobco received from Arch, Dobco failed to prove that J&A's conduct caused Dobco to suffer any unrecovered loss. Accordingly, J&A is liable to Dobco for $1.00 in nominal damages.

The Clerk is respectfully directed to enter an appropriate judgment. The Clerk is also directed to close all pending motions.

**SO ORDERED.**

**Dated: New York, New York**
**August 6, 2026**

**John G. Koeltl**
**United States District Judge**